RECEIVED

OCT 25 2022

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

ANTHONY E NTAMERE

                    Plaintiff,

v.

                                        Case NO  22-cv-2682 KMM/JFD

                                        Jury Trial ☒  YES ☐        NO

**AMERIHEALTH ADMINSTRATORS INC,**

**JANE DOE** aka AHA-000252, in her individual and

official capacity, **MICHELE SCHUMACHER,** in

her individual and official capacity, **MINNESOSOTA**

**DEPARTMENT OF HUMAN RIGHTS,**

**EQUAL EMPLOYMENT OPPORTUNITY**

**COMMISSION; CHARLOTTE CZARNECKI,**

in her individual and official capacity.

                    Defendants

## **COMPLAINT**

### **PRELIMINARY STATEMENT**

1.      Plaintiff, Anthony Ntamere ("Plaintiff"), Pro se, brings this action to remedy acts of
malicious defamation, willful racial discrimination, retaliation, and violation of due process
perpetrated against Plaintiff by the Defendants herein.

This action arises under 42 U.S.C. § 1983; 42 U.S.C. § 1981; Minn. Stat.§ 363A.33, subd. 1(2); Minn. Stat.§ 541.07; Minn. Stat.§ 181.962; Minn. Stat. § 181.935(a); Minn. Stat. §363A.15; Minn. Stat. § 181.932

## JURISDICTION

2.      The original jurisdiction of this Court is invoked pursuant to Title 28 U.S.C. §1331. Plaintiff's claims are substantively based on 42 U.S.C. § 1983 and 42 U.S.C. § 1981. The Court has supplemental jurisdiction over Plaintiff's State & local claims pursuant 28 U.S.C. § 1367.

## VENUE

3.      Venue is proper because Plaintiff was employed by Defendant, AmeriHealth Administrators Inc, ("AHA" or "IBC subsidiary") branch office in the County of Hennepin, State of Minnesota at the time of the discrimination and retaliation; and actions adverse to the Plaintiff which are the subject matter of this civil action taken in this judicial district.

4.      All conditions precedent to the institution of this suit have been fulfilled. Plaintiff received A Notice of Right to Sue letter dated September 12, 2022, and post marked September 14, 2022. This action has been filed within forty-five (45) days of receipt of said notice.

5.      Plaintiff has satisfied all other jurisdictional prerequisites to the maintenance of this action.

## BACKGROUND

6.      Independence Blue Cross PA ("IBC") is the parent company to AmeriHealth Administrators Inc ("AHA") and a group of other affiliates and subsidiaries. IBC and AHA share human resource duties, responsibility, and personnel. IBC promotes and practices a culture of willful blindness managed by its HR employees, who primarily function as its public relations officers. IBC's creative HR solutions as known to me are subversive. IBC corporate culture of willful blindness permeated its workforce and beyond.

Defendant, Charlotte Czarnecki, EEOC investigator ( "Czarnecki"), Defendant, US Equal Employment Opportunity Commission ( "EEOC") and Defendant, Minnesota Department of Human Rights ( "MDHR") have been included as parties to this civil action due to Czarnecki's mishandling

of Plaintiff 2019 EEOC charge (444-2019-01685), cross-filing to Pennsylvania instead of Minnesota, EEOC and MDHR refusal to prevent/rectify the mishandling of the cross-filing violated Plaintiff due process rights. Czarnecki's performed these actions under the color of law. As a result, AHA safeguarded the illegal condition of employment they used as pretext to unlawfully terminate his employment in June 2020.

Plaintiff had continuous employment since 2003 until his termination in June 2020 without any breaks in between. AHA completed its acquisition of CCStpa in 2018 around May. The former CCStpa associates worked at BCBSM 1750 Eagan site location until they relocation to AHA office located in Bloomington MN. BlueCross BlueShield of Minnesota ("BCBSM") was the parent company of CCStpa. Plaintiff worked at BCBSM call center before transitioning to CCStpa.

IBC senior human resource employees created and directly initiated the acts of the insidiously pervasive racial discrimination and malicious defamation conducts reported herein and induced other AHA employees present during these events to provide false testimony in furtherance of retaliation against Plaintiff. Plaintiff's participating in a forum is a protected activity. HR place an illegal permanent junction against Plaintiff's right to participate in protected activity, enable his later termination. IBC real reason for terminating Plaintiff's employment was to cover up a lie. There is a genuine dispute of material fact at issue in Plaintiff complaint. Did the speaker in the two-minute audio recording that Plaintiff handed to HR use the N-word. "You're a Nigger, never going to get out of that area"

## THE PARTIES

10.     Plaintiff, Anthony Ntamere started working for AHA Inc in April 2018 after they acquired CCStpa. Plaintiff's employment was terminated on June 24, 2020.

11.     Defendant, AmeriHealth Administrators Inc, Plaintiff's former employer, doing business at Bloomington Branch in County of Hennepin, Minnesota. Aver headquartered in Pennsylvania

12.     Defendant, Michele Schumacher, Director of HR, aver primary decision maker, currently works at Independence Blue Cross PA, Parent company of AHA ("IBC")

13.     Defendant, Jane Doe, anonymous witness listed on HR document labeled AHA-000252, contact information unknown.

14.     Defendant, US Equal Employment Opportunity Commission ("EEOC"), c/o Julianna Bowman (Director of Chicago District) Minneapolis Area Office, located 330 South 2nd Avenue, Suite 720, Minneapolis, MN 55401.

15.     Defendant, Charlotte Czarnecki, EEOC investigator, aver currently still employed at the Minneapolis Area EEOC branch.

16.     Defendant, Minnesota Department of Human Rights ("MDHR") o/c Rebecca Lucero, Commissioner of MDHR. In charge of Lead Investigator Tom Bernette, who refused to let Plaintiff open on the 2019 workshop incident with MDHR or resolve the mishandled cross-filing. MDHR was best situated for resolving the illegal injunction placed upon me in Plaintiff employee file.

17.     At all times relevant hereto, Defendants EEOC, MDHR & AHA were acting through its agents, servants, and employees, who were acting within the scope of their authority, course of the employment and under the direct control of Defendants

## STATEMENT OF FACTS

18.     Plaintiff is a second-generation African American male.

19.     At all times relevant hereto, Plaintiff maintained a satisfactory job performance rating with the Defendant, AHA

21.     AHA hired Plaintiff in April 2018 as Claim Payment Adjuster after they acquired CCStpa.

23.     Before the relocation to AHA office in Bloomington in May-June of 2019, Plaintiff had an exemplary career. Plaintiff's annual reviews were above expectation.

24.     Plaintiff became a full-time telecommuter after his promotion to Level III claims examiner in 2008.

25      Plaintiff last title and responsibility before his transition to AHA were as an Adjuster Specialist and Subrogation Specialist, respectively

26.     Despite CCStpa job duties being highly compartmentalized, Plaintiff managed to gain additional responsibilities and promotions due to his can-do attitude. Plaintiff was usually one of the employees asked to take on ad hoc assignment. Plaintiff accrued over 300 hours of unused PTO by the time AHA acquired CCStpa.  Plaintiff was a dedicated employee.

27.     Plaintiff knew that there was a lingering resentment among some of his peers concerning his go-with-the-flow work attitude. While it was quite a hectic, heavy volume claims operations center, Plaintiff didn't see the point in complaining about the workload as it indirectly meant more job security, and would usually shun such discussions.


28.     Plaintiff 's (2019) gross salary was over $74,000, extensive overtime worked.

29.     AHA grandfathered CCStpa employees that transferred to AHA Bloomington. Consequently, AHA benefit files show Plaintiff as having over 17 years of service before his termination.

30.     Michele Schumacher; IBC's HR Director, ("Schumacher") terminated Plaintiff employment on June 24, 2020.

31.     Plaintiff asserts that Schumacher was the primary decision maker involved in his termination,

31.     Plaintiff asserts that Schumacher supervised and/or directed prior events leading up to his termination.

32.     Plaintiff asserts that on two occasions, Schumacher knowingly entered or knowingly directed the entry of an illegal directive and a defamatory statement in Plaintiff employee file.

33.     Without these two strategically placed entries, Schumacher would not have had the pretext to deem Plaintiff participation in the June 8th, 2019, forum, and later forums a dischargeable offense.

34.     CCStpa move to AHA came with some added benefits, an upgrade in pay, specials transition and retention bonuses.  Plaintiff made ample use of IBC's 401k increased contributions level of 50%, which was above the 15% contribution level offered by BCBSM. Plaintiff considered AHA's 401k plan to be outstanding and made regular contributions at %50 of gross pay with a set goal of saving at least $110,000 by his 50th birthday. Plaintiff believe that his 401k contribution level was among

the highest within IBC if not the highest. Plaintiff had contributed $38,000 into his 401k account
prior to his termination.

35      Plaintiff personally witness Schumacher and other IBC/AHA employees audio record parts
of their training or orientation. This information is stated in my 2019 EEOC questionnaire. CCStpa
employee also openly recorded the orientation instructions because the information was voluminous.
Why was Schumacher and other AHA employees recording not considered a violation of IBC
recording policy?

36.     Plaintiff's first negative encounter involving AHA HR department occurred in August 2018
with Susan Balle, AHA Senior HR Business Partner (Balle). She rejected Plaintiff's reasonable
request to be granted exemption working on one of AHA major Account due to possible future
conflict of interest. Right afterwards, one of team Account specialist asked Plaintiff to process a
claim or a few claims for the group, even though Plaintiff had not ever worked on the group. This left
Plaintiff with the impression that the request came from Balle.

37.     Plaintiff next encounter with Balle was in December 2018 involving a minor issue that had
gotten out of hand. A contract supervisor ("supervisor") decided to start adding emotive memes to
the daily report that she sent out to the claim examiners.

38.     In plaintiff's 15 years working under BCBSM, Plaintiff had never experience anyone else
purposefully send out daily assignment with memes attached. Plaintiff concede that none of the
memes involved racial connotations. The last email that the contract supervisor sent on 12/3/2018
with a meme attached involved microaggression, exactly what Plaintiff was aiming to forestall. The
transitioning CCStpa manager, Edith Rosser ("Rosser") was cc'd on all daily report that the contract
Supervisor added memes to.

39.     Rosser sided with the supervisor on the ground that the other 5 claim examiners receiving the
report were not offended by it. She disregarded policies explicitly prohibiting use of memes in email.
Sometime during the ongoing meme incidents, Rosser carved the Plaintiff out of the report in
accommodation to Supervisor. This conduct made it difficult for Plaintiff interact with coworkers
when follow up updates or questions concerning the reports were made.

40.     Days before the contract supervisor would post the 12/03/2018 meme containing a dog with
an enlarged nose and the caption "HAPPY MONDAY, HERES A PUPPY NOSE" attached within.

Plaintiff tried working with Supervisor to seize with her expressive meme posts, but she vehemently insisted that she would continue to add them stating "I am going to continue to add the memes as I see fit. If you don't care for them, please ignore them". Plaintiff decided to push back against supervisor last meme post. It was a practical impossible for Plaintiff to avoid interacting with her memes before opening his work assignment. Plaintiff sent a responsive meme of a pig with lipstick and the caption 'HERE IS A PIG WITH A LIP' the next day. Prior to this responsive meme,

41.     Plaintiff was trying to forestall dealing with future pervasive microaggression especially now that the workforce was required to attend onsite training BCBSM location in a few days.

42.     Despite Plaintiff years of seniority and job responsibility there seemed to an expectation from some of in the workforce that Plaintiff owed them deference.

43.     Balle had Rosser send Plaints a skype invite captioned "Discuss Anthony's concerns". Unbeknownst to the Plaintiff, the true purpose of the skype invite was to discuss the Rosser and Plaintiff associate complaint. During the meeting involving Balle, Edith and Plaintiff's, Balle dismissed Plaintiff's complaints that the meme could lead to a hostile work environment if the supervisor continued to require that Plaintiff must view her meme post before receiving his assignment.

44.     Until Schumacher stepped into phone conversation, Balle's intended solution was to restrict Plaintiff from sending response memes while allowing other associates to continue the meme post, as according to Balle such situations are better judged based on the heart of the sender. With extreme reluctance on both Balle and Schumacher part, they agreed to stop memo post.

45.     Balle sent an email to all people involved– 8 people. "Please note that email should contain business information only and any pictures, memes personal phrases/quotes, etc. should not be included".

46.     But sometime around May 2020, Balle would create a similar situation whereby all AHA associates in the claims department could respond to an email thread captioned with the subject line "Motivation Monday" with motivational memes and/or personal quotes. Another attempted campaign of microaggression occurred despite Plaintiff best efforts to accommodate other employee needs of self-expression by enabling auto deletion such emails out of his view.

47.     AHA required that the transitioning CCStpa workforce start reporting onsite to attend in-person training on the new claim system. We were still working through BCBSM system in December. Plaintiff recollects during this period that he and other transitioning CCS worked onsite at the BCBSM location over a month, even though the in-person training led by an IBC trainer lasted only a few days. The remaining training sessions held or facilitated by the Philadelphia IBC trainer through skype.

48.     Plaintiff at this point began having misgivings about completing the transition over to AHA Bloomington location due to his prior encounters with IBC/AHA HR personnel and souring relationship with other workforce members.

49.     Plaintiff would find out in January that a contract deal would prevent any transitioning employee from returning to work for BCBSM. Plaintiff's prior work history would have otherwise made such a transition easy.

50.     Around January 2019, Plaintiff was subjected to his first racial incident while working onsite. A CCStpa employee referred to him as a Nigger in Rosser's presence. Plaintiff was shocked but brushed off the encounter since the associate was leaving the company

51.     Around February 2019, Plaintiff made a formal request for ADA accommodation for a documented chronic disability that worsen when in stressful public settings, requesting additional breaks only when Plaintiff is required to work onsite, along with the request that I avoid coming onsite if not necessary.

52.     In response to Plaintiff ADA request, IBC's HR scheduled an interactive meeting with Michelle Chapman, Disability Benefit Administrator ( "Chapman") and Carol Dunleavy, Sr Employee Relations Partner ("Dunleavy")

53.     Plaintiff's simple request for a very reasonable accommodation allowing him to avoid needlessly having to work onsite in the future and for the allowance of additional breaks while onsite turned into a good cop/bad cop interrogation routine.  It was a humiliating interviewing tactic subjected me to the scorn of my ADA disability.

54.     Plaintiff forwarded letter from his primary care doctor as requested by Dunleavy /and Chapman attesting that his ADA request was proper to IBC's human resource department o/c Chapman.

55.     Chapman would later inform Plaintiff in March that his application for ADA accommodation would be closed without resolution since he was had now returned back WFH status fulltime. Member insisted the accommodation be reviewed since he could be required to return onsite. Chapman later response indicated that it had been approved but it appears to member that his ADA application was now in a suspended status.  On paper it seems approved yet Plaintiff's later request to use it to excuse himself from attending first and third workshop held in July were denied at AHA request.

56.     Plaintiff went through an adversarial review process, didn't know for certain if it was approved or suspended and was refused it use by IBC HR department when he requested to be excused from the July 30 & July 31workshops.

57.     The transitioning CCStpa employee move to AHA Bloomington was completed in May-July 2019.

58.     The entire AHA Bloomington workforce were required to attend a 3-day onsite training workshop, either in the morning or evening time slot, from July 29 through July 31, 2019. The title of the three workshops were "Diversity & Inclusion Awareness ", "It's All About Respect" and "Unconscious Bias" respectively. The morning time slot was from 09:00am through 11:00am. The workshops were facilitated by visiting IBC HR officer from Philadelphia.

59.     The training was being led by three IBC HR employees: Tashima Waller; Senior Learning Specialist, ("Waller"), 10+ years of service; Jeffrey Kearns; Learning/onboarding Manager ("Kearns"), 21+ years of service; and John Clayton; Director of Diversity & Workforce Initiatives ("Clayton"), 38+ years of service; Combined all had over 60 years of experience working at IBC.

60.     Waller, Kearns, and Clayton premeditatedly submitted Plaintiff to an insidiously cleverly crafted use of a single racial slur to irrevocably strip Plaintiff remaining standing withing AHA Bloomington and structured this attack to defeat all recourses that Plaintiff would have to avail himself of the adversarial work environment that followed. The suborned my coworkers to give false testimonies to affect Schumacher's probation notices.

61.     The IBC HR trainers from Philadelphia used the cover of the deceptively labelled three-day workshop training as cover to accomplish this goal. The material used for the training seems great but it was Kearns masterful incorporation of derogatory and disparaging statement over the material that matter.

62.     Plaintiff was first to arrive at the first workshop Diversity & Inclusion that would be led mostly by Kearns. Upon arrival, Plaintiff was called aside by Clayton and ask if arrived by public transportation. While Clayton was asking this question, Plaintiff noticed that Kearns went through the motions of cellphone picture of him. Plaintiff was confused both by Clayton's and Kearns conduct but now realized their bizarre conduct was meant to gaslight him. Plaintiff does not drive and used Ubers extensively when AHA Bloomington workers were required to remain working on in January 2019 even though the training on the new system was done online.

63.     During this first training Kearns made disparaging remarks about African American saying 'The African American community is hostile to the LGBTQ interest', Neither Clayton or Waller reacted to Kearns board generalization. This statement was preceded by his comment that 20 trans-women were killed in a southern state. I had the creeping feeling that I was being singled out because I was the only black person in the entire AHA Bloomington at this time and I had ask Kearns if the also thought that religion was physical trait when he mentioned that sexual orientation was.  It was only my second time coming across sexual orientation being characterized as such. First time was when I took an online course from IBC captioned as 'Native American Culture' from BCBSM location in which the derogatory term five-dollar Indian was used to describe actor Will Roger. I was particularly puzzled that LGBTQ material was included in course.  Prior to this course transitioning CCStpa had when through 6-week course concerning Native American History that was facilitated by a professor from Augsburg University. At no time in the teaching material did the professor us the derogatory term to describe Native American not did he include any teaching material concerning LGBTQ. I came to realize that Kearns not the professor was the creator of the course we took while connected to IBC intranet during the transition period. Kearns seems to think that his status as an LGBTQ gives him a licenses to disparage others or incorporate derogatory statements about black into the workshops. Somewhere within training Kearns inexplicably tried to incorporate one AHA Bloomington association' mental health issue into the teaching material buy derogatorily using the term 'bipolar' he was standing right next to her. I was shocked by this tactic but even more confused

when many of the attendance in the room vocally objected and even Clayton stood up from his seat at the back of the room to scold Kearns to the effect 'cut it out'. I do not know who Clayton knew to ask the question of about my Transportation mode.

64.    Waller led "It's All About Respect" workshop and again some part of the teaching material that was handled to use was subverted by presentation. Waller gave multiple scenarios of harassment but in most cases the repeating instruction she added to examples what that it was best not complain. She also made discouraging statement out associates lodging complaint to the compliance hotline stating that eventually their identity would be unmasked for the investigation to go any further. At the very end of the lecture, Clayton and Waller made statement that I would only later was prescient. They both informed us that the IBC was a progressive company that actively promoted LGBTQ interest. They followed that statement with statement that if Kearns were to say or do something bad, that he would be protected. Kearns appeared subdued during the entirety of the second workshop.

65.    Kearns led most of the third workshop. And started the class by asking where Brenda was. I was the only one to response to the effect that Brenda did attend the morning classes. She attended the evening classes. In retrospect, I think that Brenda informed HR that I didn't like the first workshop. Brenda texted me early in the morning around 6am on June 30, 2019 inquiring what I thought about the 1 training. My feed back was negative. In retrospect, I think that I was the only one in the class that didn't get the context/joke around Kearns questioning why an associated that didn't attend the morning classes was not present in his morning class. About ten minutes into Kearns lecture he would start diminishing accusation of racism but claim that we should not use the term racist as it is a loaded word. He didn't single out any other groups. Just blacks. He didn't diminish the term homophobia. It is either Kearns does this in all the 50+ lectures he has facility both inside and outside the company or he made the multiple diminishing and derogatory statement to get back at me for crossing IBC HR.

66.    Plaintiff does not know the original starting point of IBC's subsidiary decision to disenfranchise him of Section 1981 rights but aver that the earliest known beginning would be his encounter with Susan Balle in August 2018 and that latest would be before the start of the third workshop.

67.     At this juncture of events, Plaintiff completely distrusted IBC's HR members due to his prior encounters, and now considered them public relations employees cleverly disguised as HR. Despite these misgivings, Plaintiff knew that he had to endure the process before he could consult help outside of the company. He did not want to create a duplicate process where there were two open complaints, one internally in IBC and other with EEOC.

68.     Plaintiff made many follow up inquiry regarding the status of his complaint and escalated to Thomas Hutton, IBC's General Counsel ( "Hutton") and Barbara Cooney, Mgr Office & Legal, ( "Cooney"), only because Debreu chose not to let Plaintiff know that the case was still in open status.

69.     On the exact same day (August 20, 2019) that Schumacher closed Plaintiff complaint with an entry of a Probation Notice into Plaintiff employee file, He registered a complaint with EEOC. This was in stark contrast, to how Plaintiff would later response to Schumacher terminating his employment. Plaintiff wrongly had faith in EEOC safeguarding his due process right.

70.     Plaintiff complaint against EEOC due to the conduct of its agent Czarnecki does not concern the dismissal of his 2019 EEOC charge (444-2019-01685).  Plaintiff is cognizant that EEOC and its agents have the discretion to dismiss cases as they see fit.  EEOC and its agents do not have a right to mishandle the cross-filing of a charging parties complaint to the wrong state, nor do they have a right to deprive such party of the employer's position statement.

71.     Plaintiff asserts that Czarnecki act of cross-filing his charge to PHRC in Pennsylvania instead of MDHR in Minnesota, which resulted in a nullification of Plaintiff right to a local review, was an intentional act, and that the deprivation of Plaintiff access to his employer's position statement was in furtherance of said intentions.  Only a hearing or discovery would shed light on facts of this claim.

72.     MDHR was the agency best situated to resolving the concerns raised in 444-2019-01685, as local agency specializing in resolving violations in their infancy, in contrast to the Federal government approach of waiting until such violation ripens

73.     Plaintiff Interview meeting with EEOC investor, Czarnecki, was held at 9:30am on January 01, 2020.  It lasted about 30 minutes and was not cordial.  Czarnecki came of bias because she made up false statement of state laws in defense of IBC and incorrectly stated that for my age discrimination to be valid, I would have to be older than the accused. She came off as being better suited to act as IBC's attorney.

74.     Czarnecki wasn't happy that I had recorded the workshop session and decided to make up false claims of state law prohibiting such while simultaneously saying she didn't want to elaborate because the issue outside EEOC jurisdiction. In a more bizarre turn, in her stance against my recording, she mistakenly though I had informed her that Kearns received our permission so there was nothing wrong with their recording. This was illogical because even in a two party-state, if one party within the group openly record then the other party can also record with seeking permission. I find it puzzling that an EEOC investigator, with a decade experience, who I believe resides in Minnesota, would go about discouraging people from recording evidence.

75.     Plaintiff recorded his interview with Czarnecki and expect that she would have done the same. Nowhere within the 30-minute discussion did plaintiff ask Czarnecki to cross-file his charge to PHRC. At the ending of the interview, Czarnecki told me that I will get a notice to sign my charge online once it has been prepared. Czarnecki would unnecessarily call me back sometime before 4pm to discuss my charge preparation. Plaintiff asserts that there was absolutely no reason for Czarnecki to call him back as all the information she need was either in his intake questionnaire or answered during the interview. Plaintiff assert that Czarnecki only reason for call him back was so that she could later make the false claim that it was the Plaintiff that request the cross-filing to PHRC in Pennsylvania. Due to this unexpected and engineered contact Plaintiff had with Czarnecki, he was unprepared to make a recording of the conversation. It appeared to be an ambush tactic. My best recollection is that Czarnecki asked Plaintiff where the decision maker resided to elicit an excuse for her telling me she would file it to PHRC.  If the Plaintiff had for some unknown inexplicable reason ask to have his case filed to Pennsylvania, an EEOC investigator, with over a decade of experience residing in Minnesota should have known better.  The residence of the charging party is what determines where a charge is cross-filed. Only a hearing or discovery would shed light as to whether Czarnecki mishandling of my charge to PHRC and closing my case before I could get a response from my employer was innocent or malfeasance.

76.     Plaintiff would later in the day, sometime after 4pm, send an email to Czarnecki asking her to recuse herself from his complaint.  Czarnecki multiple display of incompetence or deception left Plaintiff in doubt of her ability to properly investigate his claims.

77.     Plaintiff believes that Czarnecki was in consultation with IBC HR employees, including Jeanie Heffernan, Exec VP/Chief Human Resources Officer, IBC ( "Heffernan") before my charge

was unceremoniously closed with the employer position statement. Only through a hearing or discovery process would Plaintiff be able to ascertain the extent to which Czarnecki played a role to my charge being junked.

78.    The employee position statement meant a lot to Plaintiff because he was being gaslighted into juggling multiple different scenarios as to what Schumacher unsubstantiated claim meant. IBC intentionally and purposefully left the Plaintiff in the dark as to how the investigation was conducted for the emotional and mental effect it would have on him.

79.    Schumacher sent out a company-wide memo to the AHA Bloomington employee, either sometime right after the first probation was entered into my file or right after EEOC closed my charge, admonishing employees about characters she found to be unbecoming.  It was targeted towards me.

80.    When plaintiff discovered the closed in tried in vain to get answers as why it was closed to soon but must important: why it was closed without his employer position statement and cross-filed to the wrong state. I sent multiple email, online inquires, call EEOC employees and probably also spoke / or tried to spoke to Czarnecki as to why there were so many red flags on who my case was handled. Czarnecki and other EEOC agents chose not to rectify the mishandling of the cross-filing. Czarnecki filled out my charging document. I did not physically reach out fill out the charge document on the other end of the phone.  Plaintiff believe that Julianne Bowman, EEOC, Chicago District Director is amply aware of the journey of my case due to the progressive interest on the other side of my complaint.

81.    Pennsylvania PHRC will only accept complaint regarding discrimination if the complainant lives and works in the state of Pennsylvania. There are no exceptions to this rule.  Beside this, their protection is inferior to MDHR.

82.    Plaintiff efforts to reach to MDHR to resolve the cross-filing error was fruitless.  Plaintiff's known first effort at reaching out to MDHR is record as having taken place on January 20, 2020 through 'inf.MDHR@State.mn.us'. Most if not all subsequent contact with MDHR was made through Tom Bernette, Lead Investigator ( "Bernette").  Plaintiff followed all the steps that Bernette recommended to resolve the issue including mailing his EEOC file to MDHR but to no avail.

83.    Bernette, last communication in January 2020 regarding the misfiling of Plaintiff charge to
stated, "Because the charge was cross-filed with a different state agency, we will not be able to assist
you; you would have to contact the Pennsylvania Human Relations Commission". This is the reason why
I have listed MDHR as a defendant in this action because the fix should lie with them even though the
did not cause Czarnecki. I am seeking a court injunction that would force the local agency of the
charging party to resolve any such future problem or it would me that Czarnecki and other EEOC agents
have a backdoor tactic to systematically junk any case that they choose.

84.    2020 was a tumultuous for us all and worsen by the recording of George Floyd murder. Had not
been for the recording of this murder, I would simply not have been able to believe any claim made by
anyone that officer would maliciously knelt on a human being neck until his life drains out.

85.    Had officer Derek Chauvin not been caught on camera on chose to sue the witness for malicious
defamation, I would have convicted with the severest of penalty despite the fact that I am not a policy
apologist. I hate liar who make false claims of racial discrimination.

86.    by June 2020, it now been many months since I endure IBC premediated racial harassment at
dubious workshops where the three IBC HR employees coordinated there visceral and public degrading
before my all non-black employees and induced them to make false statements about the event,
followed with an obvious sham investigation and the permanent injuncted placed into my employee file
enforce a change in employment condition that nobody else within the whole of AHA endured.

87.    Plaintiff case is only tangentially related to the George Floyd incident except that then CEO of
IBC,  Dan Hilferty ( "Hilferty"), well-known stateman in Philadelphia attempts at creating a falsehood
that discredited IBC's history of racism.

88.    Before Plaintiff decision to participate in email linked forums in the company's IWAY intranet
site, he did not ever again raise the workshop incidents the with anyone in the company, except an
attempt to do at his annual review with his manager and annual compliance review with a compliance
officer. Nor did Plaintiff every again engage his AHA Bloomington associates in it regards due to fear of
other reprisal.  Plaintiff who was already well-known as being quiet and reserved had to further isolate
himself.

89.     Following Floyd's murder, Hilferty went on a speaking tour statewide and regionally with statements condemning racism/hate and sent out multiple company-wide emails in its regard. Plaintiff didn't participate in any previous forums that might have arisen from such email. Plaintiff attended multiple town hall meetings organized both by AHA & IBC leadership. In these numerous events Plaintiff observed but didn't provide any feedback during any discussions.

90.     On June 8, Hilferty sent out a company-wide email with a video memo attached acknowledging racism within company by making forward looking statement of address it. Plaintiff found the email and the video memo to be insincere considering who long Hilferty had served as CEO and Plaintiff personal history with racism that initiated by self-professed, white male LGBTQ activist.  Plaintiff decided to participate in the forum in IWAY that was linked to the email by posting an opposition statement highlighting his prior racist treatment.

91.     Plaintiff would get an email from Clayton that cc'd to Waller asking him to setup a meeting where the details of 2019 complaint investigation would be discussed with him. For the first time since the event Clayton now wanted to discuss it after having ignored plaintiff prior requests to do so in July 2019.  Clayton reported directly to Heffernan during Plaintiff employment at AHA Bloomington. I declined. It was not crystal clear to me that Clayton true function was as a public relation officer as opposed.

92.     For public relations reason, Clayton now saw it fit to discuss the investigation with Plaintiff after all HR employees purposefully worked to keep me in dark. Clayton belated offer to know inform me about the details of the investigation is but another example of IBC corporate culture of disenfranchising associates who complain.  Why did Debreu not inform me that the investigation was ongoing. Why did Schumacher & Dunleavy choose not to provide Plaintiff with details of IBC investigation via email when they refused to talk to me over the phone. Why did Dunleavy subvert my request to see my employee file in violation of **Minn. Stat. § 181.961.**  Dunleavy sent Plaintiff a thin folder that was deplete of my employee files or any information related to the investigation when Plaintiff attempted to exercise his right immediately after the notice of his first probation. Dunleavy ignored inquires as to why the folder didn't contain any of files that were transferred from BCSMN to AHA—no documents related to the

93.     Schumacher placed plaintiff on a 2nd probation notice right after he declined Clayton offer to discuss his June 8 post.  Schumacher stated within the noticed  "By posting your comment on June 8,

2020, you violated the directive in your 2019 probation to make any complaints solely to Carol Dunleavy or the compliance hotline. Additionally, the post violated the company's Harassment Free Workplace Policy and Computing Devices Acceptable Use Policy because you used the company's intranet site to transmit defamatory and harassing content and because you falsely accused another individual of harassment in a malicious manner".

94.     In response to the second Probation Notice, Plaintiff decided to alert associates participating in the forum that Hilferty statements of addressing racism within the company were empty.  Plaintiff does not know how many other associates that participated in any of the forums IBC opened were punished by Schumacher or other IBC agents.  The forum in IWAY that was opened off the June 5 video statement that CEO emailed company-wide was now being used to accomplish the complete opposite of its stated goal. It was being used in a preemptive manner to chill any opposition to racism within he company. It was being used to bait and catch associates opposed racism.  Plaintiff was exercising both his Federal statutorily protected rights to participate in opposition and was doing so in the right manner and right avenue. Plaintiff's following posts to alerts IBC associates participating in open forum to the true purpose of the open was protected by Minn. Stat. § 181.932 Minnesota Whistleblower Act.

95.     Plaintiff continued  to participate in the meeting that AHA and IBC held without providing any feedback. Before Plaintiff termination on June 24 2020, Plaintiff had accepted an invite from IBC to join a discussion being led by Clayton that was captioned "Emotions in the Black community" and also in the forum linked to the invite that he was looking forward to

## CONCLUSION

AHA stated reason for firing me is contracted by the fact that Schumacher repeatedly, on at least occasion, reference the clause tucked into my 2019 probation noticed that illegally prohibited me from raising any concerns related to my employment unless such concerns managed by Dunleavy or associate compliance hotline.  Waller and Clayton made it clear to the AHA Bloomington associates that the associate compliance hotline is a joke.

In part of email Schumacher Plaintiff notifying him of his termination she wrote "on at least two separate occasions, the most recent occasion being in your probation document, you were directed to raise any concerns you have related to your employment to Carol Dunleavy in Human Resources or to the associate compliance hotline"

COUNT 1

42 U.S.C. § 1983;

Paragraphs 1 through 6;  70 through 77;  and 80 through 83 above are incorporated herein by reference as if more fully set forth at length.

Involves Defendants EEOC, MDHR, & CZARNECKI

COUNT 2

42 U.S.C. § 1981;

Paragraphs 1 through 6; 7 through 70; 78 through 79; and 84 through 93 above are incorporated herein by reference as if more fully set forth at length.

Involves Defendants AMERIHEALTH ADMINSTRATORS INC, JANE DOE aka AHA-000252, MICHELE SCHUMACHER

COUNT 3

Minn. Stat.§ 363A.33, subd. 1(2);

Paragraphs 1 through 6; 7 through 70; 78 through 79; and 84 through 93 above are incorporated herein by reference as if more fully set forth at length.

Involves Defendants AMERIHEALTH ADMINSTRATORS INC, JANE DOE aka AHA-000252, MICHELE SCHUMACHER

COUNT 4

Minn. Stat.§ 541.07

Paragraphs 1 through 6; 7 through 70; 78 through 79; and 84 through 93 above are incorporated herein by reference as if more fully set forth at length.

Involves Defendants AMERIHEALTH ADMINSTRATORS INC, JANE DOE aka AHA-000252, MICHELE SCHUMACHER

COUNT 5

Stat.§ 181.962

Minn. Stat.§ 541.07

Paragraphs 1 through 6; 7 through 70; 78 through 79; and 84 through 93 above are incorporated herein by reference as if more fully set forth at length.

Involves Defendants AMERIHEALTH ADMINSTRATORS INC, JANE DOE aka AHA-000252, MICHELE SCHUMACHER

COUNT 6

Minn. Stat. § 181.935(a)

Paragraphs 1 through 6; 7 through 70; 78 through 79; and 84 through 93 above are incorporated herein by reference as if more fully set forth at length.

Involves Defendants AMERIHEALTH ADMINSTRATORS INC, JANE DOE aka AHA-000252, MICHELE SCHUMACHER

COUNT 7

Minn. Stat. §363A.15; Minn

Paragraphs 1 through 6; 7 through 70; 78 through 79; and 84 through 93 above are incorporated herein by reference as if more fully set forth at length.

Involves Defendants AMERIHEALTH ADMINSTRATORS INC, JANE DOE aka AHA-000252, MICHELE SCHUMACHER

COUNT 8

Minn. Stat. § 181.932

Minn. Stat. §363A.15; Minn

Paragraphs 1 through 6; 7 through 70; 78 through 79; and 84 through 93 above are incorporated herein by reference as if more fully set forth at length.

Involves Defendants AMERIHEALTH ADMINSTRATORS INC, JANE DOE aka AHA-000252, MICHELE SCHUMACHER

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully pray:

a.      That the practices complained of herein be adjudged, decreed, and declared to be in violation of the Plaintiff's legal right under Minnesota and Federal law.

b.      That the Defendant, AmeriHealth Administrators Inc, be required to make Plaintiff whole for its adverse, retaliatory, and unlawful actions through restitution in the form of back pay, including the monetary value of any employment benefits he would have been entitled to as an employee Defendant, with interest of an appropriate inflation factor.

c.      That Plaintiff be awarded front pay and the monetary value of any employment benefits he would have been entitled to as an employee of defendant for a reasonable period of time into the future.

d.      That the above monetary awards be trebled pursuant to Minn. Stat. § 363A.29, Subd. 4.

e.      That Plaintiff be awarded compensatory damages in excess of fifty thousand dollars ($50,000.00), in an amount to be determined at trial.

f.      Plaintiff gives notice of intent to seek Equitable doctrine relief on matters so related to both Federal and States claims under appropriate statutes.

g.      Plaintiff request an administrative hearing or any similar hearing with this court power to investigate Czarnecki's conduct, in particular the allegation that she might have spoken to anyone at IBC or its family of companies or any of it representative before mishandling Plaintiff charge.

H       Plaintiff request a court injunction that would force the local government agency to take on the responsibility of fixing issue

**      Plaintiff give notice of intent to amend his complaint under rule 15.01

h.      Plaintiff gives notice of intent to seek leave to amend her Complaint to seek punitive damages, pursuant to Minn. Stat. § 549.191.

i.      That the Court award Plaintiff cost and disbursement pursuant to any applicable laws of statues.

k.      That the Court grant such other and further relief as it deems fair and equitable.


### PLAINTIFF DEMANDS A JURY ON ALL COUNTS.

Dated: October 25, 2022                          Anthony Ntamere (Pro Se)

179 McKnight Road North, Suite 309

Saint Paul, MN 55119

Ph No: 612.237.8229

antamere@outlook.com