# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

ANTHONY E NTAMERE

        Plaintiff,

v.

                          Case NO  22-cv-2682 KMM/JFD

                          Jury Trial  ☒   YES  ☐

                          **SECOND AMENDED COMPLAINT**

**INDEPENDENCE BLUE CROSS OF PA,**

**AMERIHEALTH ADMINSTRATORS INC,**

**JANE DOE** aka AHA-000252, in her individual and

official capacity, **MICHELE SCHUMACHER**, in

her individual and official capacity, John Clayton in his

individual and official capacity, Jeffrey Kearns in his

individual an official capacity, Tashima Waller in her

individual and official capacity, **MINNESOTA**

**DEPARTMENT OF HUMAN RIGHTS,**

**EQUAL EMPLOYMENT OPPORTUNITY**

**COMMISSION**; **CHARLOTTE CZARNECKI**,

in her individual and official capacity, **MINNESOTA**

**ATTORNEY GENERAL; KEITH ELLISON**, in his

official capacity, **MDHR COMMISSIONER; RECECCA**

LUCERO, in her official capacity, **MDHR LEAD**

**INVESTIGATOR; TOM BERNETTE**, in his official capacity.

        Defendants

1

## COMPLAINT

### PRELIMINARY STATEMENT

1.      Plaintiff, Anthony Ntamere ("Plaintiff"), Pro se, brings this action to remedy acts of willful racial discrimination, retaliation, malicious defamation, and violation of due process perpetrated against Plaintiff by the Defendants herein.

This action arises under 42 U.S.C. § 1983; 42 U.S.C. § 1981; Minn. Stat. §363A.15; Minn. Stat. § 363A.08, subd. 2; Minn. Stat. § 181.932; Minn. Stat.§ 181.962; Minn. Stat. § 181.935(a).

### JURISDICTION

2.      The original jurisdiction of this Court is invoked pursuant to Title 28 U.S.C. §1331. Plaintiff's claims are substantively based on 42 U.S.C. § 1983 and 42 U.S.C. § 1981. The Court has supplemental jurisdiction over Plaintiff's State & local claims pursuant to 28 U.S.C. § 1367.

### VENUE

3.      Venue is proper in this Court because Plaintiff was employed by Defendant, AmeriHealth Administrators Inc, in Hennepin County and Defendant does significant business here.

4.      All conditions precedent to the institution of this suit have been fulfilled. Plaintiff received A Notice of Right to Sue letter dated September 12, 2022. This action has been filed within 45 days of receipt of said notice.

### BACKGROUND

5.      Independence Blue Cross of PA ("IBC") is the parent company to AmeriHealth Administrators Inc ("AHA") and a group of other affiliates and subsidiaries. IBC and AHA share human resource duties, responsibility, and personnel. IBC promotes and practices a culture of willful blindness managed by its HR employees, who function as its public relations officers. Because of this structuring, IBC can practice creative HR solutions that subvert protected activity rights by using preemptive policies and rules that chill and nullify such rights. IBC corporate culture of willful blindness permeated its workforce and beyond.

2

6.     Because of Czarnecki misconducts that caused the revocation of Plaintiff's rights to a local review of his 2019 EEOC Charge (444-2019-01685), Defendants, Charlotte Czarnecki, ("Czarnecki"), Equal Employment Opportunity Commission ("EEOC") and Minnesota Department of Human Rights ("MDHR") are parties to this civil action. EEOC and MDHR failed to prevent and/or rectify the cross-filing of Plaintiff's charge to Pennsylvania instead of Minnesota. As a result, AHA safeguarded the illegal condition of employment they later used as a pretext to end Plaintiff's employment.

7.     Plaintiff had continuous employment since 2003 until his termination in June 2020. AHA acquired CCStpa around April 2018. Blue Cross Blue Shield of Minnesota ("BCBSMN") was the parent company of CCStpa. AHA new hires worked at BCBSMN Eagan, MN, location until their relocation to AHA's Bloomington, MN, branch office. Plaintiff worked at BCBSMN before transferring to CCStpa.

8.     IBC senior HR employees created, implemented, and promoted the insidiously pervasive racial discrimination and malicious defamation actions against Plaintiff. In furtherance of retaliation against Plaintiff, IBC HR suborn other AHA employees to provide false testimony. HR enacted and enforced a permanent junction against Plaintiff's statutorily protected activity rights. Plaintiff's taking part in a forum is a protected activity. AHA real reason for terminating Plaintiff's employment was to chill opposition.

## THE PARTIES

9.     Plaintiff, Anthony Ntamere ("Plaintiff") became an AHA employee in April 2018 after they acquired CCStpa

10.    Defendant, AmeriHealth Administrators Inc, doing business at Bloomington Branch in County of Hennepin, Minnesota. headquartered in Pennsylvania.

11.    Defendant, Michele Schumacher ("Schumacher"), IBC's Director of HR, aver primary decision maker.

12.    Defendant, John Clayton ("Clayton"), IBC's Director of Diversity & Workforce Initiatives, supervisor of the July 29-31, 2019, workshop.

13.    Defendant, Jeffrey Kearns ("Kearns"), IBC's Learning/onboarding Manager.

14.    Defendant, Tashima Waller ("Waller"), Senior Learning Specialist.

15.    Defendant, Jane Doe, anonymous witness listed on HR document labeled AHA-000252, contact information unknown.

16.    Defendant, US Equal Employment Opportunity Commission ("EEOC"), c/o Julianna Bowman (Director of Chicago District) Minneapolis Area Office, located 330 South 2nd Avenue, Suite 720, Minneapolis, MN 55401.

17.    Defendant, Charlotte Czarnecki, EEOC investigator, Minneapolis Area EEOC branch.

18.    Defendant, Minnesota Department of Human Rights ("MDHR") o/c Rebecca Lucero, Commissioner of MDHR

19.    At all times relevant hereto, Defendants EEOC, MDHR & AHA were acting through its agents, servants, and employees, who were acting within the scope of their authority, course of the employment and under the direct control of Defendants

## STATEMENT OF FACTS

20.    Plaintiff is a second-generation African American male.

21.    At all times relevant hereto, Plaintiff maintained a satisfactory job performance rating with the Defendant, AHA.

22.    AHA hired Plaintiff in April 2018 as Claim Payment Adjuster. Plaintiff's prior title and responsibility were as an Adjuster Specialist and Subrogation Specialist, respectively.

23.    AHA grandfathered its new hires tenure. AHA benefit files show Plaintiff as having over 17 years of service before his termination.

24.    Before the relocation to the AHA office in Bloomington, Plaintiff had an exemplary career. Plaintiff's annual reviews exceeded expectation.

25.    Plaintiff became a full-time telecommuter in 2008 after his promotion to Level III claims examiner.

26.    Plaintiff 's 2019 gross salary was over $74,000, extensive overtime worked.

27.    Schumacher terminated Plaintiff's employment on June 24, 2020.

28.    Plaintiff asserts that Schumacher was the primary decision-maker involved in his termination. Schumacher supervised & coordinated prior events leading up to his termination. On two occasions, Schumacher entered or directed the entry of an illegal directive and a malicious, defamatory statement in Plaintiff's employee file. Without these two strategically placed entries, Schumacher would not have had the pretext to deem Plaintiff's participation in the June 8th, 2020, forum, and later forums a fireable offense.

29.    Plaintiff gained additional responsibilities and promotions because of his can-do attitude and was usually the employee asked to take on ad hoc assignment. Plaintiff was a dedicated employee who had accrued over 300 hours of unused PTO by April 2018.

30.    For example, Plaintiff volunteered to handle all BlueCard claim reports when CCStpa began migrating to the BlueCard platform in 2008. The BlueCard claims accounted for over 75% of the CCStpa entire claims inventory by 2018, yet Plaintiff single-handedly managed these reports.

31.    Plaintiff knew there was a lingering resentment among his peers concerning his go-with-the-flow work attitude. It was a high-volume claims operations center. However, Plaintiff didn't see the point in complaining about the workload as it indirectly meant more job security and usually shunned such discussions.

32    Plaintiff's approach to interacting with his coworkers was to maintain limited social interactions but make himself readily available for work-related activities. This approach, enhanced by his telecommuting status, created a moat that shielded Plaintiff from a toxic work environment-only accessible if workrelated, otherwise unavailable.

33.    Plaintiff's prior successful approach to preventing and mitigating hostilities began to unravel with the introduction of IBC's corporate culture.

34    In August 2018, Susan Balle ("Balle"), AHA, Senior HR Business Partner, denied Plaintiff's future exemption from working a specific account.  Immediately after her denial, Plaintiff was required to process claims on the account despite having no prior history of doing so.

35.     In plaintiff's 15 years working under BCBSMN, Plaintiff had never experienced anyone else purposefully send out daily assignments with memes attached. Plaintiff concedes that none of the memes involved racial connotations. The last email that the contract supervisor sent on 12/3/2018 with a meme attached involved microaggression, exactly what Plaintiff was aiming to forestall. The transitioning CCStpa manager, Edith Rosser ("Rosser") was cc'd on all daily reports that the contract Supervisor added memes to.

37.     Rosser sided with the supervisor on the ground that the other 5 claim examiners receiving the report were not offended by it. She disregarded policies explicitly prohibiting use of memes in email. Sometime during the ongoing meme incidents, Rosser carved the Plaintiff out of the report in accommodation to Supervisor. This conduct made it difficult for Plaintiff interact with coworkers when follow up updates or questions concerning the reports were made.

38.     Days before the contract supervisor would post the 12/03/2018 meme, a closeup picture of a dog's nose and the caption "HAPPY MONDAY, HERES A PUPPY NOSE", attached within. Plaintiff tried working with Supervisor to seize with her expressive meme posts, but she vehemently insisted that she would continue to add them stating, "I am going to continue to add the memes as I see fit. If you don't care for them, please ignore them". Plaintiff decided to push back against supervisor last meme post.  It was impossible for Plaintiff to avoid interacting with her memes before accessing his work assignment. Plaintiff sent a responsive meme the following day pig with lipstick, 'HERE IS A PIG WITH A LIP' the next day. Prior to this responsive meme,

39.     Plaintiff was trying to forestall dealing with future pervasive microaggression especially now that the workforce was required to attend onsite training BCBSMN location in a few days.

40.     Despite Plaintiff years of seniority and job responsibility there seemed to be an expectation from some in the workforce that Plaintiff owed them deference.

41.     Balle had Rosser send Plaints a skype invite captioned "Discuss Anthony's concerns".  Unbeknownst to the Plaintiff, the true purpose of the skype invite was to discuss the Rosser and Plaintiff associate's complaints instead. During the meeting involving Balle, Edith and Plaintiff's, Balle dismissed Plaintiff's complaints that the meme could lead to a hostile work

environment if the supervisor continued to require that Plaintiff must view her meme post before receiving his assignment.

42.    Until Schumacher stepped into phone conversation, Balle's intended solution was to restrict Plaintiff from sending response memes while allowing other associates to continue the meme post, as according to Balle such situations are best judged based on the heart of the sender. With extreme reluctance on both Balle and Schumacher part, they agreed to stop memo post.

43.    Balle sent an email to all people involved– 8 people. "Please note that email should contain business information only and any pictures, memes personal phrases/quotes, etc. should not be included".

44.    AHA required that the transitioning CCStpa workforce start reporting onsite to attend in-person training on the new claim system. We were still working through BCBSMN system in December. Plaintiff recollects during this period that he and other transitioning CCS worked onsite at the BCBSMN location for over a month, even though the in-person training led by an IBC trainer lasted only a few days. The remaining training sessions were held or facilitated by the Philadelphia IBC trainer through skype.

45.    Plaintiff at this point began having misgivings about completing the transition over to AHA Bloomington location due to his prior encounters with IBC/AHA HR personnel and souring relationship with other workforce members.

46.    Plaintiff found out in January that a contract deal would prevent any transitioning employee from returning to work for BCBSMN. Plaintiff's prior work history would have otherwise made such a transition easy.

46.    Around January 2019, Plaintiff was subjected to his first racial incident while working onsite. A CCStpa employee referred to him as a Nigger in Rosser's presence. Plaintiff was shocked but brushed off the encounter since the associate was leaving the company

47.    Around February 2019, Plaintiff made a formal request for ADA accommodation for a documented chronic disability that worsen when in stressful public settings, requesting additional breaks only when Plaintiff is required to work onsite, along with the request that I avoid coming onsite if not necessary.

48.    In response to Plaintiff ADA request, IBC's HR scheduled an interactive meeting with Michelle Chapman, Disability Benefit Administrator ("Chapman") and Carol Dunleavy, Sr Employee Relations Partner ("Dunleavy")

49.    Plaintiff's simple request for a very reasonable accommodation allowing him to avoid needlessly having to work onsite in the future and for the allowance of additional breaks while onsite turned into a good cop/bad cop interrogation routine.  It was a humiliating interviewing tactic subjecting him to the scorn of his ADA disability.

50.    Plaintiff forwarded letter from his primary care doctor as requested by Dunleavy /and Chapman attesting that his ADA request was proper to IBC's human resource department o/c Chapman.

51.    Chapman would later inform Plaintiff in March that his application for ADA accommodation would be closed without resolution since he had now returned to WFH status fulltime. Member insisted the accommodation be reviewed since he could be required to return onsite.  Chapman later response indicated that it had been approved unless my situation changes, but it appears to member that his ADA application was now in a suspended status.  Plaintiff's later request to use it to excuse himself from attending the second and third workshop held in July were denied at AHA request.

52.    Plaintiff went through an adversarial review process, didn't know for certain if it was approved or suspended and was refused it use by IBC HR department when he requested to be excused.

53.    By July 2019, AHA new-hire relocation to AHA Bloomington office was completed.

54.    AHA required its Bloomington employees to attend onsite either the morning or afternoon sessions of the 3-day training workshop: Diversity & Inclusion Awareness; It's All About Respect; and Unconscious Bias, presented by the three visiting IBC HR employees from Philadelphia, held from July 29-31, 2019,

55.    The visiting IBC HR employees: Tashima Waller ("Waller"), Senior Learning Specialist; Jeffrey Kearns ("Kearns"), Learning/onboarding Manager; and John Clayton ("Clayton"), Director of Diversity & Workforce Initiatives–with at least 10-, 21- & 38-years' experience at IBC,

respectively. Clayton and Waller are African American. Kearns is a white male, self-professed LGBTQ activist.

56.     The primary goal of the morning workshops was anything but about inclusion.  Its primary goal was to use Plaintiff as a scapegoat to indoctrinate AHA Bloomington associates to IBC corporate culture of willful blindness.

57.     Waller and Clayton were working in concert with Kearns when he subjected Plaintiff to a cleverly crafted, insidious use of a single racial slur which irrevocably affected his standing within AHA and adversely affected the term, condition, and privilege of his employment. Kearns's statement on the last day of the workshop, "You're a Nigger, never going to get out of that area." was preceded by multiple disparaging, derogatory and diminishing statements he made about African Americans and racism during the 3-day workshop.

58.     Kearns designed his presentation of the workshop material to strip Plaintiff of the dignity the workshop training supposedly protected. Kearns structured his attack to defeat all recourses that Plaintiff would have at work or in court or beyond to avail himself of the adverse racial treatment.

59.     Kearns's treatment had so severe an effect on the Plaintiff that he remained in shock for the remaining training, wondering why the only black person at AHA Bloomington could be so blatantly singled out for such treatment. To date, Plaintiff cannot imagine a more harmful use of a single racial slur. In front of his all-white associates (some of whom were involved in the meme complaint), during an anti-bias training supervised by an African American Director of diversity, such an incident would occur.

60.     Plaintiff was first at the first workshop, which Kearns primarily led. Clayton called Plaintiff aside and asked if he had arrived by public transportation. Plaintiff noticed Kearns go through the motion of taking a cellphone picture of him. Plaintiff was confused by Clayton's and Kearns' conduct but later realized it was meant to gaslight him.

61.     The first workshop focused primarily on LGBTQ interests. Kearns reintroduced the teaching material promoting sexual orientation as a 'physical trait' that Plaintiff encountered while taking a mandatory online course titled, "Native American Culture."

62.    The teaching material in the "Native American Culture" was in stark contrast to Prof. Buffalohead's earlier lectures "Native American History" held at CCStpa around May 2018, before the relocation, where he admonished against using derogatory Native Americans terms and where no concerns involving LGBTQ interests were raised.

63.    Only then, did Plaintiff realize that Kearns, not the Professor, was responsible for creating the online course "Native American Culture" where Will Roger was described as a famous "Five-Dollar-Indian" and LGBTQ interest were raised.  Plaintiff had to affirm in the online course that sexual orientation was a "physical trait" before he could proceed further.

64.    During this first training Kearns made disparaging remarks about African American saying, "The African American community is hostile to the LGBTQ interest", Neither Clayton nor Waller reacted to Kearns broad generalization. This statement was preceded by his comment, that about black 20 trans-women were killed in a southern state. I had the creeping feeling that I was being singled out because I was the only black person in the entire AHA Bloomington at this time, and I had beforehand asked Kearns if the also thought that religion was a physical trait when he lectured that sexual orientation was.  It was only my second time coming across sexual orientation being characterized as such.

65.    Somewhere within this training Kearns inexplicably tried to incorporate one AHA Bloomington association' mental health issue into the teaching material by derogatorily using the term 'bipolar' he stood right next to her. I was shocked by this tactic but even more confused when many of the attendants in the room vocally objected and even Clayton stood up from his seat at the back of the room to scold Kearns to the effect "cut it out"

66.    Waller led the second workshop and again some part of the teaching material that was handled to use was subverted by its presentation.  Waller gave multiple scenarios of harassment but in most cases the repeating instruction she added to examples what that it was best not complain. She also made discouraging statements against associates lodging complaints to the compliance hotline, stating that eventually their identity would be unmasked for the investigation to proceed.  At the very end of the lecture, Clayton and Waller made statements that I would only later find to be prescient. They both informed us that the IBC was a progressive company that actively promoted LGBTQ interest. They followed that statement with statements that if Kearns were to say or do something

10

bad, that he would be protected.  Kearns appeared subdued during the entirety of the second workshop.

66.    Kearns led most of the third workshop. And started the class by asking where Brenda was. I was the only one to response to the effect that Brenda did not attend the morning classes. She attended the evening classes. In retrospect, I think that Brenda informed HR that I didn't like the first workshop. Brenda texted me early in the morning around 6am on June 30, 2019, inquiring what I thought about the training. My feedback was negative.  In retrospect, I think that I was the only one in the class that didn't get the context/joke around Kearns questioning why an associated that didn't attend the morning classes was not present in his morning class. About ten minutes into Kearns lecture he would start diminishing accusation of racism but claiming that we should not use the term racist as it is a loaded word.  He didn't single out any other groups. Just blacks.  He didn't diminish the term homophobia. It is either Kearns does this in all the 50+ workshops he has facilitated both inside and outside the IBC, or he made the multiple diminishing and derogatory statement to get back at me for crossing IBC HR.

67.    At this juncture of events, Plaintiff completely distrusted IBC's HR members due to his prior encounters, and now considered them public relations employees cleverly disguised as HR. Despite these misgivings, Plaintiff knew that he had to endure the process before he could consult outside help. He did not want to create a duplicate process where there were two open complaints, one internally in IBC and EEOC.

68.    Plaintiff made many follow up inquiry regarding the status of his complaint and escalated to Thomas Hutton, IBC's General Counsel ("Hutton") and Barbara Cooney, Mgr. Office & Legal, ("Cooney"), only because DeAbreu chose not to let Plaintiff know that the case was still in open status.

69.    Plaintiff witness Schumacher and other IBC/AHA employees audio record parts of their training and orientation held at the BCBSMN site. AHA's new hires also openly recorded the orientation sessions. Yet, unlike Plaintiff's recording of the training workshops held in 2019, IBC did not deem Schumacher's and other associates' recordings a violation of IBC's policy.

70.     On the exact same day (August 20, 2019) that Schumacher closed Plaintiff complaint with an entry of a Probation Notice into Plaintiff employee file, He registered a complaint with EEOC. This was in stark contrast to how Plaintiff would later response to Schumacher terminating his employment. Plaintiff wrongly had faith in the EEOC safeguarding his due process right.

71.     Plaintiff complaint against EEOC due to the conduct of its agent Czarnecki does not concern the dismissal of his 2019 EEOC charge.  Plaintiff is cognizant that EEOC and its agents have the discretion to dismiss cases as they see fit.  EEOC and its agents do not have a right to mishandle the cross-filing of a charging parties' complaint to the wrong state, nor do they have a right to deprive such party of the employer's position statement.

72.     Plaintiff asserts that Czarnecki act of cross-filing his charge to PHRC in Pennsylvania instead of MDHR in Minnesota, which resulted in a nullification of Plaintiff right to a local review, was an intentional act, and that the deprivation of Plaintiff access to his employer's position statement was in furtherance of said intentions.  Only a hearing or discovery would shed light on facts surrounding this claim.

73.     MDHR was the agency best situated to resolving the concerns raised in 2019 EEOC charge, as local agency specializing in resolving violations in their infancy, in contrast to the Federal government approach of waiting until such violation ripens.

74.     Plaintiff Interview meeting with EEOC investor, Czarnecki, was held at 9:30am on January 06, 2020.   It lasted about 30 minutes and was not cordial.  Czarnecki came off as bias because she made up false statements of state laws in defense of IBC and incorrectly stated that for my age discrimination to be valid, I would have to be older than the accused. She came off as being better suited to act as IBC's attorney.

75.     Czarnecki wasn't happy that I had recorded the workshop session and decided to make up false claims of state law prohibiting such while simultaneously saying she didn't want to elaborate because the issue is outside EEOC jurisdiction. In a more bizarre turn, in her stance against my recording, she mistakenly thought I had informed her that Kearns received our permission so there was nothing wrong with IBC's recording. This was illogical because even in a two party-state, if one party within the group openly records then the other party can also record without seeking

permission. I find it puzzling that an EEOC investigator, with over a decade experience, who I believe resides in Minnesota, would go about discouraging people from recording evidence.

76.    Plaintiff recorded his interview with Czarnecki and expected that she would have done the same. Nowhere within the 30-minute discussion did plaintiff ask Czarnecki to cross-file his charge to PHRC. At the end of the interview, Czarnecki told Plaintiff that I will get a notice to sign my charge online once it has been prepared. Czarnecki would unnecessarily call me back sometime before 4pm to discuss my charge preparation. Plaintiff asserts that there was absolutely no reason for Czarnecki to call him back as all the information she needed was either in his intake questionnaire or answered during the interview. Plaintiff asserts that Czarnecki only reason for call him back was so that she could later make the false claim that it was the Plaintiff that requested the cross-filing to PHRC in Pennsylvania. Due to this unexpected and engineered contact Plaintiff had with Czarnecki, he was unprepared to make a recording of the conversation. It appeared to be an ambush tactic. My best recollection is that Czarnecki asked Plaintiff where the decision maker resided to elicit an excuse for her telling him she would file it to PHRC.  If the Plaintiff had for some unknown, inexplicable reason asked to have his case filed to Pennsylvania, an EEOC investigator, with over a decade of experience residing in Minnesota should have known better.  The residence of the charging party is what determines where a charge is cross-filed. Only a hearing or discovery would shed light as to whether Czarnecki mishandling of my charge to PHRC and closing my case before I could get a response from my employer was innocent or malfeasance.

77.    Plaintiff would later in the day, sometime after 4pm, send an email to Czarnecki asking her to recuse herself from his complaint.  Czarnecki multiple display of incompetence or deception left Plaintiff in doubt of her ability to properly investigate his claims.

78.    Plaintiff believes that Czarnecki was in consultation with IBC HR employees, including Jeanie Heffernan, Exec VP/Chief Human Resources Officer, IBC ("Heffernan") before my charge was unceremoniously closed without the employer position statement. Only through a hearing or discovery process would Plaintiff be able to ascertain the extent to which Czarnecki played a role in my charge being junked.

79.    The employee position statement meant a lot to Plaintiff because he was being gaslighted into juggling multiple different scenarios as to what Schumacher unsubstantiated claim

meant. IBC intentionally and purposefully left the Plaintiff in the dark as to how the investigation
was conducted for the emotional and mental effect it would have on him.

80.    Schumacher sent out a company-wide memo to the AHA Bloomington employee,
either sometime right after the first probation was entered into my file or right after EEOC closed my
charge, admonishing employees about characters she found to be unbecoming.  It was targeted
towards Plaintiff,

81.    When plaintiff discovered the closed in tried in vain to get answers as why it was
closed to soon but must important: why it was closed without his employer position statement and
cross-filed to the wrong state. I sent multiple emails, online inquires, call EEOC employees and
probably also spoke / or tried to spoke to Czarnecki as to why there were so many red flags on who
my case was handled. Czarnecki and other EEOC agents chose not to rectify the mishandling of the
cross-filing. Czarnecki filled out my charging document. I did not physically reach out fill out the
charge document on the other end of the phone.  Plaintiff believes that Julianne Bowman, EEOC,
Chicago District Director is amply aware of the journey of my case due to the progressive interest on
the other side of my complaint.

82.    Pennsylvania PHRC will only accept complaint regarding discrimination if the
complainant lives and works in the state of Pennsylvania. There are no exceptions to this rule.
Beside this, their protection is inferior to MDHR.

83.    Plaintiff efforts to reach MDHR to resolve the cross-filing error was fruitless.
Plaintiff's known first effort at reaching out to MDHR is record as having taken place on January 20,
2020, through 'inf.MDHR@State.mn.us'. Most if not all subsequent contact with MDHR was made
through Tom Bernette, Lead Investigator ("Bernette").  Plaintiff followed all the steps that Bernette
recommended to resolve the issue including mailing his EEOC file to MDHR but to no avail. Lead
Investigator Bernette, who refused to let Plaintiff open on the 2019 workshop incident with MDHR
or resolve the mishandled cross-filing. MDHR was best situated to resolve the illegal injunction
placed upon Plaintiff employee.

84.    Bernette, last communication in January 2020 regarding the misfiling of Plaintiff
charge to stated, "Because the charge was cross-filed with a different state agency, we will not be able
to assist you; you would have to contact the Pennsylvania Human Relations Commission".  This is the

reason why I have listed MDHR as a defendant in this action because the fix should lie with them even though they did not cause Czarnecki actions. I am seeking a court injunction that would force the local agency of the charging party to resolve any such future problem or it would me that Czarnecki and other EEOC agents have a backdoor tactic to systematically junk any case that they choose.

85.    2020 was a tumultuous for us all and worsen by the recording of George Floyd murder. Had not been for the recording of this murder, I would simply not have been able to believe any claim made by anyone that a police officer would maliciously kneel on a human being neck until his life drains out.

86.    Had Officer Derek Chauvin not been caught on camera,  chose to sue the witness for malicious defamation, I would have convicted with the severest penalty even though I am not a police apologist.  I hate liars who make false claims of racial discrimination.

87.    by June 2020, it now been many months since I endure IBC premediated racial harassment at dubious workshops where the three IBC HR employees coordinated there visceral and public degrading before my all non-black employees and induced them to make false statements about the event, followed with an obvious sham investigation and the permanent injuncted placed into my employee file enforce a change in employment condition that nobody else within the whole of AHA endured.

88.    Plaintiff case is only tangentially related to the George Floyd incident except that then CEO of IBC, Dan Hilferty ("Hilferty"), a well-known stateman in Philadelphia, attempts at creating a falsehood that discredited IBC's history of racism.

89.    Before Plaintiff decision to participate in the email-linked forums in the company's IWAY intranet site, he did not ever again raise the workshop incidents with anyone in the company, except an attempt at  his annual review with his manager and at annual compliance review with a compliance officer. Nor did Plaintiff ever again engage his AHA Bloomington associates in its regards due to fear of other reprisal. Plaintiff, who was already well-known as being quiet and reserved, had to further isolate himself.

90.    Following Floyd's murder, Hilferty went on a speaking tour statewide and regionally with statements condemning racism/hate and sent out multiple company-wide emails in its regard.

Plaintiff didn't participate in any previous forums that might have arisen from such email. Plaintiff attended multiple town hall and meetings organized both by AHA & IBC leadership. In these numerous events Plaintiff observed but didn't provide any feedback during any discussions.

91.    On June 5, Hilferty sent out a company-wide email with a video memo attached acknowledging racism within company by making forward looking statement of addressing it. Plaintiff found the email and the video memo to be insincere considering how long Hilferty had served as CEO, and Plaintiff personal history with racism that was initiated by Kearns. Plaintiff decided to participate in the forum in IWAY that was linked to the email by posting an opposition statement highlighting his prior racist treatment.

92.    Plaintiff would get an email from Clayton that cc'd to Waller asking him to setup a meeting where the details of his 2019 complaint investigation would be discussed. For the first time since the event Clayton now wanted to discuss it after having ignored plaintiff prior requests to do so in July 2019. Clayton reported directly to Heffernan during Plaintiff employment at AHA Bloomington. I declined. It was now crystal clear to me that Clayton true function was as a public relation officer.

93.    For public relations reason, Clayton now saw it fit to discuss the investigation with Plaintiff after all HR employees purposefully worked to keep me in dark. Clayton belated offer to now inform me about the details of the investigation is but another example of IBC corporate culture of disenfranchising associates who complain. Why did DeAbreu not inform me that the investigation was ongoing? Why did Schumacher & Dunleavy choose not to provide Plaintiff with details of IBC's investigation via email when they refused to talk to me over the phone? Why did Dunleavy subvert my request to see my employee file in violation of **Minn. Stat. § 181.961?** Dunleavy sent Plaintiff a thin folder that was deplete of my employee files or any information related to the investigation when Plaintiff attempted to exercise his right immediately after the notice of his first probation. Dunleavy ignored inquires as to why the folder didn't contain any of files that were transferred from BCSMN to AHA, no documents related to the investigation.

94.    Plaint asserts Dunleavy caused the actions adverse to Plaintiff's right under Minn. Stat. § 181.961. during this time to undermine his EEOC complaint activities and in furtherance of gaslighting.

95.    Schumacher placed plaintiff on a 2nd probation notice right after he declined Clayton offer to discuss his June 8 post. Schumacher stated within the notice, "By posting your comment on

June 8, 2020, you violated the directive in your 2019 probation to make any complaints solely to Carol Dunleavy or the compliance hotline. Additionally, the post violated the company's Harassment Free Workplace Policy and Computing Devices Acceptable Use Policy because you used the company's intranet site to transmit defamatory and harassing content and because you falsely accused another individual of harassment in a malicious manner".

96.    In response to the second Probation Notice, Plaintiff decided to alert associates participating in the forum that Hilferty statements of addressing racism within the company were empty.  Plaintiff does not know how many other associates that participated in any of the forums IBC opened were punished by Schumacher or other IBC agents.  The forum in IWAY that was opened off the June 5 video statement that CEO emailed company-wide was now being used to accomplish the opposite of its stated goal. It was being used in a preemptive manner to chill any opposition to racism within the company. It was being used to bait and catch associates opposed to racism.  Plaintiff was exercising both his Federal statutorily protected rights to participate in opposition and was doing so in the right manner and right avenue. Plaintiff's following posts to alerts IBC associates participating in open forum to the true purpose of the open was protected by Minn. Stat. § 181.932 Minnesota Whistleblower Act.

97.    Plaintiff continued to participate in the meeting that AHA and IBC held without providing any feedback. Before Plaintiff termination on June 24, 2020, Plaintiff had accepted an invite from IBC to join a discussion being led by Clayton that was captioned "Emotions in the Black community" and also in the forum linked to the invite that he was looking forward to

98.    Only after the later request for Plaintiff employee file right after his termination did Plaintiff realize the extent of DeAbreu's sham investigation and excuse that enable IBC to label my complaint as unsubstantiated.

99.    DeAbreu intentionally asked leading questions designed to result in a given outcome.

100.    AHA benefit provided an upgrade in wages, transition and retention bonuses, and an increased 401k contribution percentage of 50%, above the 15% contribution level offered by BCBSMN. Plaintiff made regular contributions at 50%, intending to save at least  $110,000 more by his 50th birthday. Plaintiff had contributed $38,000 into his 401k account before his termination. Plaintiff AHA with a total of $138,000 combined 401k accounts. Nothing is left of the 401k accounts

due to actions Plaintiff had to take to cure a pending $15,000+ loan in AHA 401k and other adverse outcomes managing account post termination. There is no scenario in which Plaintiff would have lost his 401k had he still been employed, on the contrary, he would have been halfway meeting this 50th birthday goal. Plaint has been employed since August 2022, but even when he works over-time in his new job, he makes less than he did an hour at AHA. These are examples of the impact IBC's conduct had on Plaintiff post termination.

## CONCLUSION

101.     AHA stated reason for firing me is contracted by the fact that Schumacher repeatedly, on at least occasion, reference the clause tucked into my 2019 probation noticed that illegally prohibited me from raising any concerns related to my employment unless such concerns managed by Dunleavy or associate compliance hotline.  Waller and Clayton made it clear to the AHA Bloomington associates that the associate compliance hotline is a joke.

In part of email Schumacher Plaintiff notifying him of his termination she wrote "on at least two separate occasions, the most recent occasion being in your probation document, you were directed to raise any concerns you have related to your employment to Carol Dunleavy in Human Resources or to the associate compliance hotline"

## COUNT 1
### (Deprivation of Civil Rights by Discriminatory Process in Violation of 42 U.S.C. § 1983)
### (Against Defendant MDHR, AHA and Czarnecki)

102.     Plaintiff realleges the allegation contained within the preceding and subsequent paragraphs and incorporates by reference herein.

103.     Defendant Czarnecki's deliberate cross-filing of Plaintiff 2019 Charge to Pennsylvania's PHRC instead of Minnesota's MDHR violated Plaintiff's due process rights to a local review.

104.     Defendant Czarnecki knew or should have known that the location for dual filing a charge is determined by the charging party's residency, not the residency of the decision markers. Pennsylvania's PHRC accepts complaints only from persons living and working in Pennsylvania.

105.    MDHR and EEOC refused Plaintiff multiple attempts to rectify the violation of his due process right to a local review.

106.    Consequently, the illegal restriction Schumacher placed against Plaintiff's right to protected activity was safeguarded and later used to terminate his employment.

107.    The MDHR Appeal reviewer of Plaintiff 2021 MDHR complaint, claims that they could have done something to remove the restriction had I timely filed a complaint with MDHR! Sarcasm?

108.    The chilling effect of Czarnecki thwarting MDHR review of Plaintiff's 2019 EEOC charge resulted in him being fearful of interacting with EEOC or MDHR after his termination. It wasn't until July 21, 2021, that Plaintiff managed to gather the courage to file a MDHR intake form. Plaintiff is entitled to judgement against Defendants in reasonable amount in excess of $50,000

## COUNT 2
### Discriminatory Treatment Because of Race in Violation of 42 U.S.C. § 1981
### (Against Defendants IBC, AHA, Kearns, Clayton, and Waller)

109.    Plaintiff realleges the allegation contained within the preceding and subsequent paragraphs and incorporates by reference herein.

110.    While Plaintiff was employed by AHA, Defendants Kearns, Clayton, Waller engaged in unlawful employment practices by collaboratively singling him out during the workshops, in a blatant manner, for disparaging and derogatory statements against African Americans, concluding the workshop with the insidious use of the N-word, designed to create the adverse condition of employment that followed.

111.    Kearns, Clayton, and Waller's actions were premeditated, intentional, and insidiously structured to irrevocably disenfranchise Plaintiff of his right to be free of adverse treatments.

112.    They engaged in these unlawful employment practices with malice and reckless disregard for Plaintiff's Federal and States Rights.

113.    The unlawful employment practices that followed the workshop training include, without limitation, disparate treatment, discipline, and termination of employment because of Plaintiff's race.

114.    As a result of the above-referenced conduct by Defendants, Plaintiff suffered and continue to suffer loss of wages and benefits, mental and emotional distress and anguish, damage to reputation, loss of enjoyment of life and other consequential damages. Plaintiff is entitled to judgement against Defendants in reasonable amount in excess of $50,000

## COUNT 3
### Retaliation for Engaging in Protected Activity in Violation of 42 U.S.C. § 1981
### (Against Defendants IBC and AHA)

115.    Plaintiff realleges the allegation contained within the preceding and subsequent paragraphs and incorporates by reference herein.

116.    Plaintiff had a good faith belief that IBC was engaged in discriminatory and retaliatory conduct in violation of § 1981, both when spoke to IBC HR in 2019 and when he participated in the 2020 forum, complaining about the racist and retaliatory treatment he encountered from senior HR employees.

117.    Plaintiff engaged in protected opposition to Defendants IBC's HR unlawful employment practices by complaining about discrimination and retaliation against him.

118.    In retaliation for Plaintiff's truthful complaints and reasonable opposition to IBC's unlawful discrimination and retaliation against him, Defendants IBC & AHA engaged in unlawful retaliatory employment practices by (a) placing him on probation in 2019, (b) placing a permanent restriction on his protected activity right, (c) placing him on probation in 2020, (d) knowingly added defamatory statement his in employee file, (e) terminating his employment.

119.    As a result of the above-referenced conduct by Defendants, Plaintiff suffered and continue to suffer loss of wages and benefits, mental and emotional distress and anguish, damage to reputation, loss of enjoyment of life and other consequential damages. Plaintiff is entitled to judgement against Defendants in reasonable amount in excess of $50,000.

## COUNT 4
### Reprisal in violation of the MHRA - Minn. Stat. §363A.15
### (Against Defendants IBC and AHA)

120.    Plaintiff realleges the allegation contained within the preceding and subsequent paragraphs and incorporates by reference herein.

121.    Plaintiff had a good faith belief that IBC was engaged in discriminatory and retaliatory conduct in violation of § 1981, both when spoke to IBC HR in 2019 and when he participated in the 2020 forum, complaining about the racist and retaliatory treatment he encountered from senior HR employees.

122.    Plaintiff engaged in protected opposition to Defendants IBC's HR unlawful employment practices by complaining about discrimination and retaliation against him.

123.    In retaliation for Plaintiff's truthful complaints and reasonable opposition to IBC's unlawful discrimination and retaliation against him, Defendants IBC & AHA engaged in unlawful retaliatory employment practices by (a) placing him on probation in 2019, (b) placing a permanent restriction on his protected activity right, (c) placing him on probation in 2020, (d) knowingly added defamatory statement his in employee file, € terminating his employment.

124.    As a result of the above-referenced conduct by Defendants, Plaintiff suffered and continue to suffer loss of wages and benefits, mental and emotional distress and anguish, damage to reputation, loss of enjoyment of life and other consequential damages.

125.    By reason of the above-alleged conduct, Plaintiff is entitled to judgment against Defendant in a reasonable amount in excess of $50,000.

**COUNT 5**
**Race Discrimination in Violation of the MHRA- Minn. State. § 363A.08, subd. 2**
**(Against Defendants: IBC, AHA, Kearns, Clayton, and Waller)**

126.    Plaintiff realleges the allegation contained within the preceding and subsequent paragraphs and incorporates by reference herein.

127.    While Plaintiff was employed by AHA, Defendants Kearns, Clayton, Waller engaged in unlawful employment practices by collaboratively singling him out during the workshops, in a blatant manner, for disparaging and derogatory statements against African Americans, concluding the workshop with the insidious use of the N-word, designed to create the adverse condition of employment that followed.

128.    Kearns, Clayton, and Waller's actions were premeditated, intentional, and insidiously structured to irrevocably disenfranchise Plaintiff of his right to be free of adverse treatments.

129.    They engaged in these unlawful employment practices with malice and reckless disregard for Plaintiff's Federal and States Rights.

130.    The unlawful employment practices that followed the workshop training include, without limitation, disparate treatment, discipline, and termination of employment because of Plaintiff's race.

131.    As a result of the above-referenced conduct by Defendants, Plaintiff suffered and continue to suffer loss of wages and benefits, mental and emotional distress and anguish, damage to reputation, loss of enjoyment of life and other consequential damages.

132.    By reason of the above-alleged conduct, Plaintiff is entitled to judgment against Defendant in a reasonable amount in excess of $50,000.


**COUNT 6**
**Violation of the Minnesota Whistleblower Act – Minn. Stat. § 181.932**
**(Against IBC, AHA, Clayton and Schumacher)**

133.    Plaintiff realleges the allegation contained within the preceding and subsequent paragraphs and incorporates by reference herein.

134.    Plaintiff plaint was acting in good faith when he alerted the attendants of IWAY forum that he had been placed on probation by Schumacher in retaliation for participating in the forum.

135.    Plaintiff was acting not just in opposition to racism at the time of the posting but to alert other posters that IBC started goal for allowing the forum was false.  Instead of the forum stated goal of let affected workforce member discuss their experience within IBC, it was being used to ferret out anyone disclosing racism they experience in IBC.

136.    IBC had the option of closing the forum instead falsely let their workforce believe former CEO Hilferty claims that the company would make changes within the company to combat racism moving forward.

137.    The unlawful employment practices complained above were intentional and were calculated at discrediting any employees raising concerns that tarnished IBC image.

138.    Defendants retaliated against him by terminating his employment on June 24, 2020.

139.    By reason of the above-alleged conduct, Plaintiff is entitled to judgment against Defendant in a reasonable amount in excess of $50,000, and to civil fines and all remedies pursuant to Minn. Stat. § 181.935(c), excluding reinstatement.

**COUNT 7**
**(DEFAMATION)**
**(Against Defendants Schumacher, Clayton, and Jane Doe employee)**

140.    Plaintiff realleges the allegation contained within the preceding and subsequent paragraphs and incorporates by reference herein.

141.    Plaintiff was subjected retaliatory defamation to discredit his truthful reporting of Kearns' use of racial slur and utterance of multiple derogatory and disparaging statements against African American prior to his use of the N-word, "You're a Nigger, never going to get out of that area"

142.    All three above-reference Defendants knowingly and intentionally made numerous false statements that portrayed Plaintiff as liar. All false statements were placed in Plaintiff employee files further tarnishing his reputation as somebody who either told a bold lie or somebody mentally unable.

143.    After Plaintiff post to IWAY forum, Clayton not only lied that Kearns didn't use the N-word during the 2019 workshop but tried to gaslight me into question myself by stating what was heard by the person(s) who investigated my complaint was Kearns stumbling over the word. "never".

144.    Schumacher knowingly used this false narrative to place me on another probation and upgraded her previous statement in my employee file from my 2019 complaint being unsubstantiated to an accusation that I made a false statement, defaming and harassing other employees in a malicious manner.

145.    Jane doe employee not only dismissed not hearing Kearns use the N-word but also clearly stated in no uncertain terms that if Kearns had said what I claim he said it would have been in the context of the training.

146.     Plaintiff has reason to believe that Kearns would more likely than not deny having used the N-word considering the existence of the audio recording, but would instead excuse its use.

147.     The statements were not qualifiedly privileged because they were not made in good faith, were motivated by retaliatory animus, in furtherance premediated actions and done to cover up a lie and protect IBC corporate culture of willful blindness.

148.     As a result of these false statements made by the above-referenced Defendants and collaboration of other IBC workforce members, Plaintiff endure the mental anguish, self-doubt.  If not for Plaintiff's successful documentation Kearns statement, Clayton's and other involved parties attempts to gaslight him would have succeeded. Plaintiff is entitled to judgement against Defendants in reasonable amount in excess of $50,000.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully pray:

a.     That the practices complained of herein be adjudged, decreed, and declared to be in violation of the Plaintiff's legal right under Minnesota and Federal law.

b.     That the Defendants IBC & AHA, be required to make Plaintiff whole for its adverse, retaliatory, and unlawful actions through restitution in the form of back pay, including the monetary value of any employment benefits he would have been entitled to as an employee of Defendant, with interest of an appropriate inflation factor.

c.     That Plaintiff be awarded front pay and the monetary value of any employment benefits he would have been entitled to as an employee of defendant AHA for a reasonable period of time into the future.

d.     That the above monetary awards be trebled pursuant to Minn. Stat. § 363A.29, Subd. 4.were applicable.

e.     Plaintiff gives notice of intent to seek equitable estoppel and/or equitable tolling relief on matters so related to Title VII and MHRA claims under appropriate statutes, with either courts and/or Defendants approval.

f.      Plaintiff requests an administrative hearing or any similar hearing with this court power to investigate Czarnecki's misconduct, determining whether said conduct was in  collaboration with any IBC employees.

g.      Plaintiff requests a court injunction that would force the charging party's local government agency to take on the responsibility of fixing such cross-filing violation/issues should they arise again in the future.

h.      Plaintiff give notice of intent to amend his complaint under rule 15.01

i.      Plaintiff gives notice of intent to seek leave to amend his Complaint to seek punitive damages, pursuant to Minn. Stat. § 549.191.

j.      That the Court award Plaintiff cost and disbursement pursuant to any applicable laws of statues.

k.      That the Court applies all remedies pursuant to Minn. Stat. § 181.935(c), excluding reinstatement.

j.      That the Court grant such other and further relief as it deems fair and equitable.


### PLAINTIFF DEMANDS A JURY ON ALL COUNTS.

Dated: November 15, 2022                            Anthony Ntamere (Pro Se)

179 McKnight Road North, Suite 309

Saint Paul, MN 55119

Ph No: 612.237.8229

antamere@outlook.com


### DEMAND TO PRESERVE EVIDENCE

Plaintiff has already made this request to AHA, twice before, to preserve evidence, right after Plaintiff termination and in July 2021. Plaintiff observed that IBC utilized a sophisticated archiving system that stored every outlook email and skype related text message for at least 2 years. It would

take an industrial strength, belabored effort to bypass such a system. The request herein applies to all Defendants

All Defendants are hereby directed to preserve all physical and electronic information

pertaining in any way to Plaintiff's employment, to Plaintiff's cause of action and/or prayers for

relief, and to any defenses to same, including, but not limited to, electronic data storage, closed

circuit TV footage, digital images, computer images, cache memory, searchable data, emails,

spread sheets, employment files, memos, text messages, any and all online social or work related

websites, entries on social networking sites (including, all IWAY posts made by employees from

May 2020 to August 2020), and any other information and/or data and/or things and/or documents

which may be relevant to any claim or defense in this litigation.

RECEIVED

NOV 1 5 2022

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

## CHARGE OF DISCRIMINATION

MN Department of Human Rights
540 Fairview Ave N Ste 201
Saint Paul MN 55104
651-539-1100
Toll-Free 1-800-657-3704
TTY 651-296-1283

*227*                    *106426*

| DEPARTMENT OF HUMAN RIGHTS OFFICE USE ONLY | |
|---|---|
| Case Number: | 72683 |
| Acknowledged by: | JW (-) |
| Date Filed: 06/24/2021 | Date Docketed: 06/28/2021 |

Any person claiming to have been discriminated against because of race, color, creed, religion, national origin, sex, sexual orientation, marital status, disability, age, public assistance status or familial status, as provided for in Chapter 363A of the Minnesota Statutes in the areas of employment, real property, public accommodations, public services, education, credit or business contracts may file a charge within one (1) year after the alleged discriminatory act with the Minnesota Department of Human Rights at the above address.

| 1. CHARGING PARTY | 2. RESPONDENT |
|---|---|
| Anthony Ntamere<br>179 McKnight Rd N #309<br>Saint Paul MN 55119 | AmeriHealth Administrators Inc<br>1900 Market St Ste 500<br>Philadelphia PA 19103 |

| 3. The discrimination was on the basis of my:<br>(Race) | 4. The discrimination was in the area of:<br>Reprisal (Employment) |
|---|---|

5. I allege the following discriminatory acts in violation of the Minnesota Human Rights Act (MHRA), Minn. Stat. § 363A.15.

I am an African American man who worked for the above-named respondent from 2003 to June 24, 2020, most recently as a Claim Payment Adjuster. My primary worksite was located at 2051 Killebrew Drive 3rd Floor, Suite 300 in Bloomington, Minnesota.

In July 2019, I attended a three-day training offered by respondent's Human Resources (HR). On the first two days of training, the presenter made statements that I perceived to have an underlying tone of racial bias. For this reason, I decided to record the presentation on the third day of training. On that day, the presenter made a comment to the effect of: "You're a nigga. You're never going to get out of that area."

I reported the racial epithet to HR the day after the presentation. To my knowledge, respondent did not discipline the presenter who made the derogatory comment. Rather, respondent placed me on probation from August 20, 2019 through November 20, 2019 as corrective action for allegedly violating respondent's recording policy when I recorded the training that contained the racial slur. The probation notice also stated I could only report future complaints to a specific HR individual or to the general complaint hotline. I was under the impression that this requirement was temporary during the probationary period as I am not aware that respondent limited other employees to these reporting mechanisms.

In June 2020, respondent's CEO issued a video statement to employees condemning racism in response to a police-involved death of a Black man in Minneapolis, Minnesota. On June 8, 2020, I commented on the video that the statement felt deceitful given that I was punished with probation for making a complaint about a racial slur used by a member of HR, who subsequently was never punished by respondent.

On June 16, 2020, respondent placed me on a second probationary period until September 13, 2020 for allegedly violating the first probationary requirement that I only complain to a specific individual or via the hotline.

(OVER)

SCANNED

NOV 1 5 2022

U.S. DISTRICT COURT ST. PAUL

Respondent also alleged I violated computer policy by posting harassing content in which I accused another individual of harassment. Any complaints I made to respondent about the racial slur were always made in good faith without any intent to harass other individuals. I believe this second probation notice was issued in a retaliatory effort to deter me from making complaints of race-based discrimination in the future.

Given the chilling effect created by this second corrective action, I posted a comment on the employee intranet on June 22, 2020 to warn others of respondent's actions toward me, including that they threatened to fire me because of the manner in which I previously reported race discrimination.

On June 24, 2020, respondent terminated my employment effective immediately. The termination email stated that I was discharged for posting the June 22, 2020 comment.

I believe the respondent has engaged in reprisal against me for engaging in protected activity. I engaged in protected activity when I complained on three occasions about the use of a racial slur toward me or in my presence and for which the perpetrator was not thoroughly investigated or disciplined. Respondent retaliated against me by placing me on probationary periods after the first two complaints and attempted to prevent future complaints by limiting the mechanisms by which I could report my concerns. Respondent ultimately terminated my employment in retaliation for warning other employees of the repercussions of making a race-based complaint of discrimination.

6. I therefore allege that the above-named respondent discriminated against me in the area and on the basis listed in sections 3 and 4 of this form, in violation of the MHRA subdivisions specified in section 5.

7. Under Minn. Stat. § 358.116 and in compliance with Minnesota Rule 5000.0050, subp. 12, I declare under penalty of perjury that everything I have stated in this document is true and correct.

_____                    ____6/24/21____
**Charging Party Signature**                                    Date

LDGJ0621

Report Discrimination Form (6/21/2021)

| | |
|---|---|
| **From:** | MN_MDHR_Discrimination Helpline |
| **Sent:** | Tuesday, June 22, 2021 8:29 AM |
| **To:** | Johnson, Gracia (MDHR) |
| **Subject:** | FW: Report Discrimination Form (6/21/2021) |
| **Attachments:** | New Recording 43 Copy Trimed 1.m4a |

**From:** Info.MDHR@state.mn.us <Info.MDHR@state.mn.us>
**Sent:** Monday, June 21, 2021 11:08 PM
**To:** MN_MDHR_Discrimination Helpline <discrimination.helpline.mdhr@state.mn.us>
**Subject:** Report Discrimination Form (6/21/2021)

**This message may be from an external email source.**
Do not select links or open attachments unless verified. Report all suspicious emails to Minnesota IT Services Security Operations Center.

# Contact Information

**Name :** Anthony Ntamere

**Email Address :** Anthony Ntamere

**Phone Number :** 6122378229

**City:** St Paul

**Zip Code:** 55119

# Incident Details

**Incident Nature:** I believe I was discriminated against

**Discrimination because of:** Race, Disability, Other:

**Respondent:** AmeriHealth Administrators

**Complaint description :**

https://chirb.it/JBePb2 ( Trimmed version of 2-min audio clip attached. ) I have a lot of forensic evidence to submit, please let me know how/where I can upload it) I was fired on 06/24/2020, after 17 years and 4 months of continuous employment that started on February 24, 2003 in (BCBSMN) before we transitioned to AmeriHealth Administrators (AHA)—an Independence Blue Cross of Pennsylvania(IBC) subsidiary. My employment was terminated because I failed to respect an illegal condition of employment requiring that I not raise any concerns or complaints internally related to my employment unless I obey the restriction that IBC director of HR, Michele Schumacher, placed on me. IBC used their overly broad corporate policy against recording on/off site of any other personnel to enable them to punish me for making an audio documentation of an HR manager using a racial slur against me. They retaliated against me by placing a permanent restriction requiring that I never raise any complaint or concerns regarding my employment unless certain restrictions were obeyed. The policy against recording is

Report Discrimination Form (6/21/2021)

not evenly enforced and it used to punish associates who document hostile work environment. There was no other way for me to proof that I was being subjected to microaggressions other than to document it. Everybody in the class in which the Manager used the N-word denied ever hearing it. Please listen to the linked trimmed 7 sec of the 2-minute audio record listed above that I fo

Submission Date:6/21/2021

| | |
|---|---|
| **From:** | Anthony Ntamere <antamere@outlook.com> |
| **Sent:** | Wednesday, June 23, 2021 10:20 PM |
| **To:** | Johnson, Gracia (MDHR) |
| **Subject:** | RE: Request for Termination Email and Other Documents |

**Sensitivity:** Private

Hi Gracia,

Listed below are additional contact and personnel information that you may need.

AmeriHealth Administrators Inc is headquartered in Philadelphia with over 501+ employees. It has other branches in addition to the Bloomington, MN branch. They have at least another branch in New Jersey. I believe they are located in the same building as Independence Blue Cross of PA (IBC) in Philadelphia.
You may need to copy the headquarters on any charges that is filed as they share the same HR resources and Legal team with their subsidiary AmeriHealth Administrators Inc.
Their address is:
AmeriHealth Administrators Inc
Phone Number 215-241-2751 ext 2 (HR)
c/o Erin Bender, Senior Counsel
1900 Market Street, Philadelphia, PA 19103.

The Independence Blue Cross of PA HR employees that were present during the workshop(direct employees of IBC)
John Clayton; Director of Diversity & Workforce Initiatives
Jeffrey Kearns; Learning/onboarding Manager
Tashima Waller; previously Senior Learning Specialist, now Diversity & Inclusion Consultant July 2017 to present

Other HR employees
Jeanie Heffernan; Exec VP/Chief Human Resources Ofcr, Independence Blue Cross, LLC
Ronald Deabreu; Sr Employee Relations Partner Independence Blue Cross; 1997-present.
Michele Schumacher; Human Resource Manager for IBC, now Director of Human resources at Independence Blue Cross 1997 - to present
Susan Balle; AHA Senior HR Business Partner Jan 2013 to Oct 2020
Carol Dunleavy; Senior Employee Relations Partner (215) 241 2556 x22556 Carol.Dunleavey@ibx.com
Erin Fitzgerald Bender; Senior Counsel at Independence Blue Cross

Thank you!

ps: I'll be checking my email every hour tomorrow but in case I fail to respond to your email within 1 hour you may text/leave a voicemail.

Anthony Ntamere
612-237-8229
**From:** Anthony Ntamere
**Sent:** Wednesday, June 23, 2021 9:22 PM
**To:** 'Johnson, Gracia (MDHR)' <Gracia.Johnson@state.mn.us>
**Subject:** RE: Request for Termination Email and Other Documents
**Sensitivity:** Private

Gracia,

The address is:

AmeriHealth Administrators
2051 Killebrew Drive 3rd Floor, Suite 300
Bloomington, MN 55423

It is right across the street from the Mall of America.

**From:** Johnson, Gracia (MDHR) <Gracia.Johnson@state.mn.us>
**Sent:** Wednesday, June 23, 2021 6:20 PM
**To:** Anthony Ntamere <antamere@outlook.com>
**Subject:** RE: Request for Termination Email and Other Documents
**Sensitivity:** Private

Thank you. Please also provide the address of your primary worksite located in Bloomington, MN or the surrounding area.

**Gracia Johnson**
Pronouns: She/Her/Hers
Investigator | Enforcement Unit
Office:  651-539-1120

**Minnesota Department of Human Rights**
540 Fairview Ave N, Suite 201, St. Paul, MN 55104
Toll Free: 1-800-657-3704 | MN Relay: 711/ 1-800-627-3529
*Our mission: to make Minnesota discrimination free* | mn.gov/mdhr
**Facebook** | **Twitter** | **Instagram** | **Email Newsletter**



**From:** Anthony Ntamere <antamere@outlook.com>
**Sent:** Wednesday, June 23, 2021 4:27 PM
**To:** Johnson, Gracia (MDHR) <Gracia.Johnson@state.mn.us>
**Subject:** RE: Request for Termination Email and Other Documents
**Sensitivity:** Private

Hi Gracia,

Yes, I will be able to print, sign and scan the documents as I have an all-one printer.  And I can do that within an hour of receiving the documents.  I identify as African American.  My current mailing address is:
179 Mcknight Road North, #309
St Paul, MN 55119

My job title at the time of my termination was Claim Payment Adjuster.

Please feel free to ask for any documents, evidence. I have a ton of them. Again, I am sorry for the making my complaint so close to the deadline. Depression and other things got in the way.
Thank you!

Sent from Mail for Windows 10

**From:** Johnson, Gracia (MDHR)
**Sent:** Wednesday, June 23, 2021 4:18 PM
**To:** Anthony Ntamere
**Subject:** RE: Request for Termination Email and Other Documents

Hi Anthony,

Thank you for these additional documents. I will draft you a charge which will allege that your termination was in retaliation for making various complaints of racial discrimination within the workplace. I will work to draft it tonight/tomorrow morning and have it out to you via email as soon as possible for signature. **Do you have a way that you would be able to print, sign and scan the documents back to us via email by end of day tomorrow?**

Please immediately provide the following information to assist me in drafting your charge:

1. Current mailing address where you can receive documents
2. How you identify your race/ethnicity
3. Your job title at the time of your termination

Thank you,

Gracia


**Gracia Johnson**
Pronouns: She/Her/Hers
Investigator | Enforcement Unit
Office: 651-539-1120

**Minnesota Department of Human Rights**
540 Fairview Ave N, Suite 201, St. Paul, MN 55104
Toll Free: 1-800-657-3704 | MN Relay: 711/ 1-800-627-3529
*Our mission: to make Minnesota discrimination free* | mn.gov/mdhr
**Facebook** | **Twitter** | **Instagram** | **Email Newsletter**



**From:** Anthony Ntamere <antamere@outlook.com>

**Sent:** Wednesday, June 23, 2021 2:41 PM
**To:** Johnson, Gracia (MDHR) <Gracia.Johnson@state.mn.us>
**Subject:** RE: Request for Termination Email and Other Documents
**Importance:** High
**Sensitivity:** Private

**This message may be from an external email source.**
Do not select links or open attachments unless verified. Report all suspicious emails to Minnesota IT Services Security Operations Center.

Hi Gracia,

I think I'm missing at least one of my post to the IWAY forum. Let me know if you need any additional information. I will send the missing IWAY post once I find it.
Thanks for your patience and sorry for rambling.

Anthony Ntamere
612-237-8229

**From:** Johnson, Gracia (MDHR) <Gracia.Johnson@state.mn.us>
**Sent:** Wednesday, June 23, 2021 2:25 PM
**To:** Antamere@outlook.com
**Subject:** Request for Termination Email and Other Documents

Hi Anthony,

Please send a copy of the termination email/letter that you received from Human Resources and any emails that show the messages you sent to the forum group about your complaints of racism in the workplace. These documents will help me see the nature of any protected activity you engaged in and how your employer responded. I will follow up with additional questions once I receive these documents.

Thank you very much for your prompt attention to this matter,

Gracia

**Gracia Johnson**
Pronouns: She/Her/Hers
Investigator | Enforcement Unit
Office: 651-539-1120

**Minnesota Department of Human Rights**
540 Fairview Ave N, Suite 201, St. Paul, MN 55104
Toll Free: 1-800-657-3704 | MN Relay: 711/ 1-800-627-3529
*Our mission: to make Minnesota discrimination free* | mn.gov/mdhr
**Facebook | Twitter | Instagram | Email Newsletter**

Report Discrimination Form (6/23/2021)

**From:**       MN_MDHR_Discrimination Helpline
**Sent:**       Wednesday, June 23, 2021 6:49 AM
**To:**         Johnson, Gracia (MDHR)
**Subject:**    FW: Report Discrimination Form (6/23/2021)
**Attachments:** audio intake complaint.mp3


**From:** Info.MDHR@state.mn.us <Info.MDHR@state.mn.us>
**Sent:** Wednesday, June 23, 2021 12:12 AM
**To:** MN_MDHR_Discrimination Helpline <discrimination.helpline.mdhr@state.mn.us>
**Subject:** Report Discrimination Form (6/23/2021)


**This message may be from an external email source.**

Do not select links or open attachments unless verified. Report all suspicious emails to Minnesota IT Services Security Operations Center.

---

# Contact Information

**Name :** Anthony Ntamere

**Email Address :** Antamere@outlook.com

**Phone Number :** 612-237-8229

**City:** St Paul

**Zip Code:** 55113

# Incident Details

**Incident Nature:** I believe I was discriminated against

**Discrimination because of:** Race, Disability, National Origin, Local Human Rights Commission Activity, Other:

**Respondent:** Independence Blue Cross of PA, via AmeriHealth Administrators

**Complaint description :**

Complaint attached as audio file, consider it a redo of intake form submitted on 06/21/21. I called the intake phone # today and left my contact info. https://chirb.it/JBePb2 (trimmed to 7 sec) https://soundcloud.com/user-785397290/blm (trimmed to 65 sec) https://soundcloud.com/user-785397290/ibc-hr-dept (The 2-minute sent to IBC HR) Pls listen to the audio recordings, linked above. Does the male speaker say- "You're a NIGGA, You're never going to get out of that area" the Director of Diversity, who is black, was present in the classroom when the speaker, Mr. Jeffrey Kearns, HR Learning/orientation manager, made the statement but failed to interject as he had been doing on other occasions during the Lecture whenever Jeffrey's foul mouth ran astray. Instead, he gaslighted me and allowed others to do the same when I filed my complaint with HR. I was fired on 06/24/20 for my failure to respect an illegal condition of employment requiring that I not raise any concerns or complaints internally related to my employment unless I obey the restriction that the director of HR, Michele Schumacher, placed on me in the form

of two probation notices: permanent restrictions!! The company's overly broad policy against recording enabled them to retaliate against me for documenting and filing a complaint. The policy against recording is not evenly enforced as I have seen others openly record but is used to punish associates who document a complaint. SEE, HEAR, SAY NO EVIL!

Submission Date:6/23/2021

hank you for your submission.



**From:** Anthony Ntamere <antamere@outlook.com>
**Sent:** Wednesday, June 23, 2021 12:25 PM
**To:** MN_MDHR Information <info.mdhr@state.mn.us>
**Subject:** RE: Thank you for your submission.

**This message may be from an external email source.**
Do not select links or open attachments unless verified. Report all suspicious emails to Minnesota IT Services Security Operations Center.

---

To Whom It May Concern,

I'm assuming that this confirmation email is for the intake form that I completed today just around 12 AM and not for the one previously submitted on June 21, 2021 around 11:45 pm as this is the first confirmation email that I have received from MDHR. I prefer the later intake form attached with an audio file summary of my complaint to be used. Please let me know what the procedure is should MDHR determines that it would neither accept my intake submission nor investigate my complaint. As noted in the later intake submission, I attached an audio recording to my intake form summarizing my complaint, along with a request in it for information as to where I would be able to submit evidence related to my complaint.

Again I apologize for submitting this complaint too close to the deadline. A multitude of reasons prevented me from submitting it earlier but the most specific reason being my previous experience in 2019 with the tactics the EEOC investigator implored to discourage me from pursuing my complaint of the original incident that happened in 2019, that would later result in my

Thank you for your submission.

termination on 06/24/20— one of which was defeating my ability to forward that dismissed 2019 EEOC complaint to MDHR for secondary review by forwarding my complaint to the wrong state, Pennsylvania, for secondary review. This prevented any secondary review of my complaint as Pennsylvania requires that you either live or work in the state to be eligible to file a complaint, which I do not. The result was that I was unable to remove the illegal condition of employment that Mrs. Michele Schumacher, Independence Blue Cross of PA(IBC), HR director, placed on me in the form a probation notices entered into my employee file that prohibited me from raising any concerns or complaints that I have about my employment, without which I would not have been fired for discussing the incident in an forum that the company setup for associates to discuss racism during the protest of George Floyd's death. In retrospect, I along with any other employees Philadelphia home office that might have brought to light their own experience of racism within IBC were punished. The forum turned out to be a bait to identify any associates who now thought it was right to complain in violation of the company's advertised corporate culture of SEE, HEAR, SAY NO EVIL.

I need to know what my next step would be in terms of filing my case in court should that be the only avenue left. I strongly prefer that MDHR handles my case than my having to go through the laborious process of a District Court. Please let me know what is the next step in the review process. Do I get a formal dismissal notice of my case from MDHR in the event they are not taking up my case, etc?
Thank you!

Anthony Ntamere
612-237-8229

From: Info.MDHR@state.mn.us <Info.MDHR@state.mn.us>
Sent: Wednesday, June 23, 2021 12:12 AM
To: Antamere@outlook.com
Subject: Thank you for your submission.

Hello,

Thank you for reporting discrimination and/or bias to the Minnesota Department of Human Rights, the state's civil rights enforcement agency.

We have received your information and our investigators are reviewing it.

**Filing out this form does not mean you filed a charge of discrimination.**

If the reported incident constitutes a potential violation of the Minnesota Human Rights Act, an investigator will reach out to you in order to collect further information to determine if we can help. Depending on the situation, staff may then recommend mediation or drafting a charge of discrimination.

If you do not hear from an investigator, we appreciate that you submitted the information because we are collecting stories, tracking bias incidents, and understanding themes in order to conduct outreach and education and change policies to create a more welcoming and inclusive Minnesota.

Learn what happens after you report discrimination or bias.

If you would like more information or have questions, please send us an email at info.mdhr@state.mn.us or call 651-539-1133 or 1-833-454-0148.

Thank you,

Thank you for your submission.

- Staff at the Minnesota Department of Human Rights

P.S. You can quickly and easily register to vote online at mnvotes.org.

*230*                    *106426*

# Minnesota Department of Human Rights (MDHR)
## Consent for Release of Information

Anthony Ntamere

v.

AmeriHealth Administrators Inc

## Explanation of Your Rights

- You have the right to request that individuals, private entities, and public agencies, exchange private data and/or information about you with the Minnesota Department of Human Rights (MDHR).
- You may withdraw your permission at any time. Withdrawing your permission will not affect the data and information MDHR has already received or exchanged in accordance with your informed consent.
- You may contact MDHR before signing this document if you have any questions.
- By giving informed consent, you are permitting the individual(s), private entities, and/or public agencies listed below to release and exchange data and information with MDHR for the purpose of investigation.

I, Anthony Ntamere, request and give my permission for the respondent in my case to release and exchange all data and information about me with MDHR.

I also give MDHR permission to share information about my case with the following individuals and entities (*i.e.,* social workers, job coaches, family members):

_____; and

_____

I understand that although data may be classified as private, the classification/treatment of the data at MDHR may not be the same and is dependent on laws or policies that apply to MDHR.

This Consent to Release Information is valid for the duration of MDHR's investigation. A photocopy of this signed Consent to Release Information is valid and may be used and relied upon as having the same force and effect as the original.

**Anthony Ntamere**
**Data Subject's Name**

_N. Etamere_                              6/24/21
**Data Subject's Signature**              **Date**

*If you are under 18, provide the name of your parent or legal guardian and their relationship to you:*

_____        _____
**Parent or Guardian Signature**          **Date**

_____        _____
**Parent or Guardian Name (Print)**       **Relationship to Data Subject**

Return to: MN Department of Human Rights
           540 Fairview Avenue N Ste 201
           Saint Paul MN 55104
           Fax: 651-296-9042



**DEPARTMENT OF
HUMAN RIGHTS**

RECEIVED

NOV 1 5 2022

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

July 28, 2022

SENT BY REGULAR 1ST CLASS & CERTIFIED MAIL

REF:   72683
Anthony Ntamere
v.
AmeriHealth Administrators Inc

Anthony Ntamere
179 McKnight Rd N Apt 309
Saint Paul MN 55119

The Minnesota Department of Human Rights (MDHR) has completed its investigation of the above-referenced charge. This letter is to inform you of the action taken on the charge you filed against AmeriHealth Administrators Inc on June 24, 2021.

<u>Investigation Determination</u>
MDHR conducted a full and impartial investigation of the allegations of your charge. After carefully considering the investigation results, MDHR determines that there is No Probable Cause to believe an unfair discriminatory practice occurred. I have, therefore, issued an Order dismissing your charge. The reasons for the dismissal are set forth in the attached Memorandum.

If you believe MDHR erred in making a determination of No Probable Cause, you may appeal and request that MDHR reconsider the determination. Please note that your case is not considered closed until the time for a reconsideration or appeal has expired.[1] Therefore, MDHR cannot provide a full copy of your case file until the appeal period has expired.

<u>How to Appeal the Determination</u>
To appeal the determination, complete **both** copies of the attached appeal forms. Identify the reasons you believe the determination is wrong. You **must** include at least one of the following along with your statement for appealing:

A. **New evidence** in support of your charge which was not considered in the original investigation; describe how this new evidence can be obtained (if not attached to your appeal statement) and how it supports your charge.

B. **Evidence which was considered** in the investigation but **not properly weighed** in reaching the determination; explain how this evidence supports your charge.

C. **Evidence which was available** in the investigation but **not considered** in reaching the determination; explain how this evidence supports your charge.

---

[1] Minn. Stat. § 363A.03, subd. 6.

AN EQUAL OPPORTUNITY EMPLOYER
540 Fairview Ave N, Suite 201 • Saint Paul, MN 55104 • Tel 651.539.1100
MN Relay 711 or 1.800.627.3529 • Toll Free 1.800.657.3704 • mn.gov/mdhr

SCANNED
NOV 1 5 2022
U.S. DISTRICT COURT ST. PAUL

If you decide to appeal, you must complete **both** copies of the attached appeal forms. You must provide one written appeal statement to MDHR and **the other to respondent**, within 30 days of receiving this letter.[2] The name(s) and address(es) for sending these documents to MDHR, and respondent and/or their legal representative, are at the end of this letter for your reference.

Failure to file your appeal (post-marked mail or delivery) with either MDHR or respondent within the 30-day deadline may result in the loss of your appeal right. MDHR may ask you to provide proof or evidence showing that you served respondent with a copy of your appeal statement. For this reason, you may choose to send respondent a copy of your appeal statement via certified or registered mail.

Appeal Determination

After a thorough review of the appeal statement and the investigative file, you will be notified by mail, whether the investigation of your charge will be re-opened. If MDHR concludes that the No Probable Cause determination should stand, that decision is final. If MDHR concludes that the determination of No Probable Cause was in error, you will be notified of further action to be taken on the charge at that time.

Your Right to File a Private Civil Action in Court

You may also file a private civil action against respondent in District Court. That action **must** be filed within **45 days** of receiving this letter. If you think you want to file, you should consult an attorney for information about how long it will take, costs, and procedures. This 45-day limit for filing is **delayed** if you file an appeal with MDHR. If after appeal, MDHR upholds the No Probable Cause determination, then you have 45 days after receiving that notification to file a civil action.[3]

How to Submit Documents

If you would like to appeal the determination, submit your documents, within 30 days of receiving this letter, using one of the following methods (listed in order of preference).

| | |
|---|---|
| EMAIL: | caseprocessing.mdhr@state.mn.us *preferred* |
| MAIL: | MN Department of Human Rights |
| | ATTN: Case Support |
| | 540 Fairview Ave N Suite 201 |
| | Saint Paul MN 55104 |
| DELIVERIES: | Not available at this time |

If you have any questions, contact MDHR at caseprocessing.mdhr@state.mn.us or 651-539-1100.

Sincerely,

Rebecca Lucero, Commissioner
Minnesota Department of Human Rights

Enclosure(s)

cc:

---

[2] Minn. Stat. § 363A.28, subd. 6(c).
[3] Minn. Stat. § 363A.33, subd.1(2).

Respondent:     AmeriHealth Administrators Inc
                ATTN:  Erin Bender, Sr Counsel
                1901 Market St Fl 43
                Philadelphia PA 19103
                erin.bender@ibx.com

If respondent is represented by legal counsel, please send your appeal to the contact listed below:

Respondent Attorney:     Steven Ludwig
                         Fox Rothschild LLP
                         2000 Market St Fl 20
                         Philadelphia PA 19103
                         sludwig@foxrothschild.com

**BEFORE THE HUMAN RIGHTS DEPARTMENT**

**OF THE STATE OF MINNESOTA**

_____

REF: 72683

Anthony Ntamere,
                      Charging Party,

against

       AmeriHealth Administrators Inc,
                      Respondent,

_____

**ORDER**

The Minnesota Department of Human Rights has investigated the above-referenced charge and,

for the reasons set forth in the attached Memorandum, has determined that there is No Probable Cause

to believe discrimination occurred. Therefore, the above-referenced charge is dismissed.

**Minnesota Department of Human Rights**

**FOR THE DEPARTMENT BY:**

Rebecca Lucero, Commissioner

Dated: July 28, 2022

**MDHR COPY**

REF: 72683
Anthony Ntamere
v.
AmeriHealth Administrators Inc

### APPEAL OF NO PROBABLE CAUSE DETERMINATION

I believe the Commissioner's determination of No Probable Cause is in error. Therefore, I request that the determination be reconsidered. My reasons for requesting reconsideration are:

☐ **I STATE THAT I HAVE DELIVERED/MAILED A COPY OF THIS APPEAL TO THE RESPONDENT.**

_____           _____

Signature of Charging Party                                            Date

Mail or bring this copy to MDHR within 30 days of receipt.
(Attach additional sheets if necessary; sign and date each sheet.)

**RESPONDENT'S COPY**

REF:     72683

Anthony Ntamere

v.

AmeriHealth Administrators Inc

### APPEAL OF NO PROBABLE CAUSE DETERMINATION

I believe the Commissioner's determination of No Probable Cause is in error. Therefore, I request that the determination be reconsidered. My reasons for requesting reconsideration are:

(Attach additional sheets if necessary; sign and date each sheet.)

_____          _____

Signature of Charging Party                                        Date

Mail or bring this copy to AmeriHealth Administrators Inc within 30 days of receipt.

REF: 72683

MEMORANDUM

The Minnesota Department of Human Rights (MDHR) has finished its investigation into this charge of discrimination and the Commissioner determines:

1. There is **NO PROBABLE CAUSE** to find that Respondent retaliatorily terminated Charging Party's employment.

<u>Background</u>

2. On June 24, 2021, Charging Party filed this charge of discrimination (charge) and alleged Respondent engaged in reprisal against him for his engagement in protected activity.[1] Specifically, Charging Party alleged Respondent retaliated against him for complaining on three occasions about the use of a racial slur when it placed him on probation and ultimately terminated his employment, in violation of the Minnesota Human Rights Act (MHRA).

3. Respondent received a copy of the charge, provided MDHR with an answer to the charge, denied it discriminated against Charging Party, and provided documents and witness interviews to support its position. Respondent asserted it terminated Charging Party's employment after he failed to follow directive to solely raise his concerns with its human resources representative or the compliance hotline.

4. Charging Party received a copy of Respondent's answer to the charge, submitted additional documents, and participated in an investigatory interview.

5. MDHR considered all relevant evidence. MDHR limited its investigation to whether Respondent violated the MHRA.

<u>Discussion</u>

6. Charging Party engaged in statutorily protected activity on July 31, 2019, when he reported the use of a racial slur during a training session. On June 24, 2020, Respondent terminated Charging Party's employment after he posted two comments on its intranet or iWay regarding the July 31, 2019, incident. These facts are sufficient to state a threshold reprisal claim.

7. Next, Respondent has the opportunity to produce a legitimate, non-discriminatory reason for its actions. Here, Respondent demonstrated Charging Party was terminated because he refused to follow repeated directives to solely raise his concerns with human resources or the compliance hotline. There was no evidence that Respondent's reason was false or pretext for retaliation.

8. Although Charging Party claimed Respondent failed to investigate his complaint, the totality of the evidence demonstrated that Respondent had indeed investigated his allegation. It was undisputed that none of the other training attendees reported hearing the slur. In fact, evidence demonstrated that when the presenter made a statement regarding mental health, Respondent employees were quick to

---

[1] Minn. Stat. § 363A.15(1).

intervene and address the statement. It therefore seems unlikely that the attendees would ignore something as egregious as a racial slur.[2]

9. On August 20, 2019, Respondent placed Charging Party on probation as corrective action for violating its recording policies. Charging Party conceded he recorded Respondent's training without prior authorization and there was no evidence of another employee engaging in similar behavior without repercussion.

10. On June 8, 2020, Charging Party reiterated his July 31, 2019, complaint on Respondent's iWay despite being directed to bring his complaints to human resources or the compliance hotline. Charging Party did not bring forward any new information or evidence to support his allegation.

11. On June 18, 2020, Respondent placed Charging Party on a second probationary period for failing to raise his concerns with human resources or the compliance hotline as he was previously directed to do. This warning does not demonstrate that Respondent had zero tolerance for his engagement in protected activity. Instead, it offered Charging Party a second chance and reiterated that his complaints must be directed through the proper channels.

12. Despite this warning, on June 22, 2020, Charging Party posted yet another comment on Respondent's iWay, again claiming that the presenter used a racial slur. As a result of Charging Party's continued insubordination, Respondent terminated his employment on June 24, 2020. There was no evidence of another employee engaging in similar behavior without repercussion.

13. Based upon MDHR's investigation, MDHR is unable to conclude that the information obtained during the investigation establishes violations of the MHRA. This does not certify that respondent is in compliance with the MHRA. No finding is made as to any other issue that might be construed as having been raised by this charge.

Conclusion

14. THEREFORE, MDHR finds that there is **NO PROBABLE CAUSE** to find that Respondent discriminated against Charging Party, in violation of the MHRA.

**Minnesota Department of Human Rights**

**FOR THE DEPARTMENT BY:**

Dated: _____          _____

Rebecca Lucero, Commissioner

---

[2] During this investigation, Charging Party submitted evidence of the alleged slur. MDHR's review of the audio clip, however, was inconclusive due to the audio quality.

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Anthony E. Ntamere<br>179 Mcknight Road North # 213<br>Saint Paul, MN 55119 | From: | Minneapolis Area Office<br>Equal Employment Opportunity<br>Commission<br>330 S 2nd Avenue, Suite 720<br>Minneapolis, MN 55401 |
|---|---|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|
| EEOC Charge No.<br>**444-2019-01685** | EEOC Representative<br>**Charlotte Czarnecki,**<br>**Investigator** | | Telephone No.<br>**(612) 552-7307** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Enclosures(s)

**Julianne Bowman,**
**District Director**

JANUARY 16, 2020
(Date Mailed)

cc:
**Erin Bender**
**Senior Consel**
**AmeriHealth Administrators Inc**
**1901 Market Street**
**Philadelphia, PA 19103**



# DEPARTMENT OF HUMAN RIGHTS

September 12, 2022

SENT BY REGULAR 1ST CLASS & CERTIFIED MAIL

REF:   72683
Anthony Ntamere
v.
AneriHealth Administrators Inc

Anthony Ntamere
179 McKnight Rd N Apt 309
Saint Paul MN 55119

AmeriHealth Administrators Inc
ATTN: Erin Bender
1901 Market St Fl 43
Philadelphia PA 19103

This letter is to inform you that the Minnesota Department of Human Rights (MDHR) has completed its review of the No Probable Cause determination issued in this case. Enclosed is the Order affirming the prior determination.

In the appeal, no new information was provided or identified which would justify a reversal of MDHR's determination or show sufficient reason to reinvestigate the case.

If you have any questions, you may contact the **Case Support** at 651-539-1117 or caseprocessing.mdhr@state.mn.us.

Sincerely,

Rebecca Lucero, Commissioner
**Minnesota Department of Human Rights**

Enclosure(s) Appeal Order

CC: Steven Ludwig

RECEIVED

NOV 15 2022

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 444-2019-01685 |

| PENNSYLVANIA HUMAN RELATIONS COMMISSION | and EEOC |
|---|---|

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| MR. ANTHONY E NTAMERE | (612) 237-8229 | 1974 |

| Street Address | City, State and ZIP Code |
|---|---|
| 179 MCKNIGHT ROAD NORTH # 213, SAINT PAUL, MN 55119 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| AMERIHEALTH ADMINISTRATORS INC | 501+ | |

| Street Address | City, State and ZIP Code |
|---|---|
| 1900 MARKET STREET, PHILADELPHIA, PA, PHILADELPHIA, PA 19103 | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

**DISCRIMINATION BASED ON** *(Check appropriate box(es).)*

☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☒ NATIONAL ORIGIN
☒ RETALIATION ☒ AGE ☒ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 02-01-2019 | 11-28-2019 |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I. I am an employee of the above named respondent. I was treated differently and less favorably than coworkers outside of my protected classes when I was subjected to racist comments during a work related training. The trainer also made negative comments toward me because I do not share his views about the GLBT population. I was also unnecessarily scrutinized for needing a reasonable accommodation for my disability. I complained about the discrimination and the respondent dismissed my complaint. I was placed on a 90-day probation after my complaint was closed.

II. Respondent's reason for the adverse employment action: I violated a policy.

III. It is my belief I was discriminated against based on my race/black, my national origin/African, my age/44, my sex/male, my disability and/or in retaliation for participating in protected activity in violation of Title VII of the Civil Rights Act of 19en64, as amended, the Age Discrimination in Employment Act of 1967, as amended and Titles I and V of the Americans with Disabilities Act of 1990, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT <br><br> SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

SCANNED

NOV 15 2022

U.S. DISTRICT COURT ST. PAUL

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.   **FORM NUMBER/TITLE/DATE.**  EEOC Form 5, Charge of Discrimination (11/09).

2.   **AUTHORITY.**  42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.   **PRINCIPAL PURPOSES.**  The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.   **ROUTINE USES.**  This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.   **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.**  Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

BEFORE THE HUMAN RIGHTS DEPARTMENT

OF THE STATE OF MINNESOTA

RECEIVED

NOV 15 2022

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

ORDER

Anthony Ntamere,
                    Charging Party,                          REF: 72683

against

AmeriHealth Administrators Inc.,
                    Respondent,

The Minnesota Department of Human Rights (MDHR) has considered charging party's request for reconsideration of the NO PROBABLE CAUSE determination under Minn. Stat. § 363A.28, subd. 6(c).

MDHR has reviewed the investigative file and determination, the information charging party submitted on appeal of the NO PROBABLE CAUSE determination and AFFIRMS the prior determination for the reasons set forth below.

Upon review and consideration, I conclude:

Procedural History

1. On June 24, 2021, charging party filed a charge of discrimination and alleged respondent violated the Minnesota Human Rights Act (MHRA) by discriminating against him in the area of reprisal, because he complained about race discrimination.[1]

2. Specifically, charging party alleged respondent discharged him in retaliation for reporting acts of discrimination and reprisal on the company intranet platform.

3. Respondent denied charging party's allegations. It submitted an answer and supporting documentation.

4. On July 28, 2022, MDHR completed its investigation and issued a NO PROBABLE CAUSE determination.

5. On August 29, 2022, charging party submitted a timely appeal. On appeal, charging party asserted that MDHR failed to consider evidence that charging party had submitted at intake and during the investigation, failed to interview certain witnesses, and failed to properly weigh the evidence that it did consider. Charging party asserted that the evidence warranted findings that respondent discriminated against him by subjecting him to a racial epithet during a July 31, 2019, employee training workshop; and that it subsequently retaliated against him by disciplining him for recording the workshop, limiting the avenues via which he could complain about discrimination or mistreatment in the future, and ultimately terminating his employment.

Summary of Facts

6. Charging party, a Black man, was employed by respondent as a claims payment adjuster.

---

[1] Minn. Stat. § 363A.15.



ORDER
REF: 72683
Page 2

7. At all relevant times, respondent maintained an intranet platform for use by its employees. The platform, called "iWay," hosted training modules, company directories, IT support information, news updates, and limited social media engagement.

8. On July 31, 2019, charging party attended an employee training workshop put on by members of respondent's Human Resources (HR) Department. He secretly made an audio recording of the workshop.

9. After the workshop was over, charging party complained to respondent that one of the presenters had used the word "Nigger" during one of the presentations.

10. Respondent conducted an investigation of charging party's complaint but did not corroborate his assertion that a presenter had used a racial slur during a presentation.

11. On August 6, 2019, charging party was issued a formal Corrective Action and was placed on probation for 90 days. The Corrective Action reminded him that company policy forbade him from secretly recording meetings without prior approval and directed him that any future internal complaints must be made to a particular HR employee or via the company's toll-free compliance hotline.

12. Ten months later, on June 8, 2020, charging party made a social media post to all employees on iWay. Referring to the workshop that had occurred nearly a year earlier, he wrote:

> [Company] does not stand against institutional racism or how else would a white male ... HR manager feel confident enough to utter the N-word in front of my coworkers ... during the training.

13. On June 16, 2020, respondent issued charging party a probation notice advising that he had violated company policies by posting defamatory and harassing content on iWay on June 8. It reminded charging party that he was required to direct all complaints about his employment to a particular HR employee or to the compliance hotline, and it warned him that further policy violations might result in the termination of his employment.

14. On June 22, 2020, charging party made another iWay posting. Ignoring the directives contained in the June 16 probation notice, charging party wrote:

> [Company} wants me to pretend that I was not called the N-word by [07/31/2019 workshop presenter] despite the fact that I provided a recording to HR ... during the anti-bias training workshop held last year in MN. Listening to [Company] talk about racism is like listening to Thomas Jeffrey [sic] advocate the abolition of slavery. A sociopath will pee on your leg and say it is raining. I'm on the verge of being fired for my refusal to let [07/31/2019 workshop presenter's] conduct go unpunished. I have now been placed on probation again by [HR representatives] with threats of being fired if I continue to complain about the July 31 [, 2019] incident. Had it not been for the recording of George Floyd being murdered we would have been left with a police report that states his death was caused by a medical distress. Before your HR dept makes good on its threat to fire me for refusing to let it be, for my refusal to accept [Company's] "See no evil, Hear no Evil, Speak no Evil" culture, let them realize that I still have the 2-minute clip recording, plus the entire recording. [Company] is not against anti-black racism, only pretending to be so for the benefit of your IMAGE.

ORDER
REF: 72683
Page 3

15. On June 24, 2020, respondent terminated charging party's employment for again posting defamatory and harassing content on the company's intranet platform.

16. Charging party filed his charge of discrimination exactly one year later, on June 24, 2021.

<u>Analysis</u>

17. By rule, a no probable cause finding can only be appealed for three reasons: (i) there is new evidence that was not available during the investigation; (ii) MDHR failed to properly weigh evidence that was available during the investigation; or (iii) statutory or case law indicates that MDHR's determination was erroneous.[2]

18. When asserting any one of these reasons, the charging party must also "identify and describe the relevance of" the evidence or law on which it relies.[3] MDHR explained these rules to charging party in a letter dated July 28, 2022.

19. As summarized above, on appeal charging party asserted that the evidence proves he was subjected to race discrimination when a presenter used a racial slur during a July 2019 training presentation, and that respondent retaliated against him in multiple ways after he complained. According to charging party, those retaliatory acts included disciplining him for violating a company policy forbidding secretly recording conversations and limiting the avenues via which he could make employment-related complaints in the future. He asserted that MDHR should have made probable cause determinations relative to each of those actions, as well with respect to the ultimate termination of his employment.

20. However, the MHRA has a one-year statute of limitations which requires a charge to be filed within one year of the alleged discriminatory or retaliatory action.[4] Here, charging party waited to file a discrimination charge until exactly one year after his employment was terminated. Any allegations of discriminatory or retaliatory treatment occurring prior to the date of charging party's discharge are therefore untimely, and MDHR lacks the authority to investigate them.

21. Accordingly, the assertions that respondent discriminated against charging party on July 31, 2019, and that it retaliated against him during the months that followed, were never timely asserted and were not under investigation in this case. Thus, most of charging party's assertions on appeal are irrelevant to the disposition of the single claim of retaliatory discharge presented by the charge.

22. To be clear, the sole timely issue presented by the charge was whether respondent discharged charging party on June 24, 2020, in reprisal for making a race discrimination complaint. In order to state a viable reprisal claim, charging party must first make threshold showings that (i) he engaged in statutorily protected activity; (ii) he was subjected to an adverse action; and (iii) a causal connection exists between the two.[5] Failure to satisfy any one of these three elements is fatal to charging party's claim.

---

[2] Minn. R. 5000.0700, subp. 8.
[3] Id.
[4] Minn. Stat. § 363A.28, subd. 3(a).
[5] Bahr v. Capella University, 788 N.W.2d 76, 81 (Minn. 2010).

ORDER
REF: 72683
Page 4

23. With respect to the first element, it is well-settled that protected activity must be exercised in a reasonable manner.[6] Courts have determined that complaints are unreasonable where the complaints involve an unlawful act, are defamatory or harassing, convey threats or intimidation, encourage others to file discrimination complaints against the employer, or significantly disrupt the workplace.[7] Thus, proportionate disciplinary action taken in response to an unreasonably conveyed complaint is generally permissible.

24. Here, charging party's June 8 and June 22 iWay postings were patently unreasonable and did not constitute protected activity. Neither posting was a serious attempt to report discriminatory treatment, and both related to the incident which had occurred nearly a year earlier – the HR trainer's alleged use of a racial slur during a workshop presentation. Charging party had already reported that incident through proper channels more than 10 months earlier, and documentation clearly showed that respondent had taken his complaint seriously and thoroughly investigated it in August 2019.[8]

25. If charging party was dissatisfied with the results of respondent's investigation of his 2019 complaint, he could have filed a charge of discrimination with MDHR at any time during the 12 months that followed; he did not do so. Instead, in June 2020 – ten months after respondent's investigation had been completed – he made two iWay postings essentially calling respondent's HR trainer a racist and accusing respondent of supporting racism. The postings – pertinent portions of which are quoted above – were objectively inflammatory and likely defamatory. They were clearly intended to shock his coworkers, target the HR trainer, and embarrass his employer.

26. It was undisputed that charging party was aware of how to make an internal discrimination complaint and had done exactly that when he reported the July 31, 2019 incident nearly a year earlier. Charging party's iWay postings were clearly not reasonable and therefore did not constitute protected activity; he was therefore unable to state a threshold retaliatory discharge claim.

27. Notably, even though charging party's postings were clearly not legitimate protected activity, respondent merely gave him a warning and cautioned him that further misconduct could result in his discharge. Less than two weeks later, charging party "doubled down," posting a rambling narrative more incendiary than the first. Respondent promptly discharged him as a result.

28. Accordingly, because charging party cannot show that his June 2020 iWay posts were legitimate protected activity, he was unable to state a legally viable retaliatory discharge claim. His claim therefore fails, and no further analysis is warranted.

---

[6] See EEOC Enforcement Guidance on Retaliation and Related Issues at II.A.2.b (August 25, 2016).
[7] See, e.g., Gogel v. Kia Motors Mfg. of Georgia, Inc., 967 F.3d 1121, 1137-37 (11th Cir. 2020)(soliciting other employees to file discrimination charges); Agyropoulos v. City of Alton, 539 F.3d 724, 733-34 (7th Cir.2008); see also Green v. McDonnell Douglas Corp., 463 F.2d 337 (8th Cir 1972).
[8] Contrary to charging party's assertions on appeal, the multiple audio recordings provided by the parties did not corroborate charging party's claim that the presenter had used a racial slur; the recordings were, at best, inconclusive. Respondent investigated and concluded that the presenter had innocently stumbled over pronunciation of the word "never." Documentary evidence showed that respondent interviewed many individuals who attended the presentation in question, and not a single one of them agreed with charging party's contention. MDHR personnel carefully listened to the recordings and reviewed the documentation, and MDHR found no evidence suggesting that respondent's conclusion was incorrect or was reached in bad faith.

ORDER
REF: 72683
Page 5

29. Although the no probable cause determination was clearly proper, MDHR notes that two of charging party's concerns would have warranted close examination, but were untimely. Respondent conceded that it placed charging party on probation in August 2019 for recording the meeting in which he claimed to have been subjected to a racial slur, and also conceded that it simultaneously instructed him that he would only be allowed to make future complaints to a particular HR representative or via the company compliance hotline. Both of those actions would have likely had a chilling effect on future reports of discrimination and may have violated the MHRA's reprisal provision. However, since charging party did not timely assert those claims, MDHR lacked authority to investigate them.

## Conclusion

30. Therefore, MDHR finds no reason to change the no probable cause determination in this matter.

31. The NO PROBABLE CAUSE Order MDHR issued on July 28, 2022, is AFFIRMED and MDHR's original memorandum is incorporated into this Order by reference.

32. Although MDHR will not take any more action on this charge of discrimination, charging party may bring a private civil action against respondent within 45 days of receiving this Order, under Minn. Stat. § 363A.33, subd. 1(2).

33. Therefore, the above-referenced charge is dismissed.

**Minnesota Department of Human Rights**

**FOR THE DEPARTMENT BY:**

Dated: September 12, 2022

Rebecca Lucero, Commissioner

Attachment to Amended Complaint

**_ADDRESS FOR SERVICE_**

RECEIVED

NOV 1 5 2022

CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

**FOX ROTHSCHILD LLP**

c/o Steven K. Ludwig

2000 Market Street, 20th Floor

Philadelphia, PA 19103-3222

Direct No: 215-299-216

Sludwig@FoxRothschild.com

**INDEPENDENCE BLUE CROSS**

c/o Thomas Hutton / Legal Department

1901 Market St. FL 43

Philadelphia, PA 19103

Litigation Area PH No: 215-241-9995 Fax No: 215-241-2624

**AMERIHEALTH ADMINISTRATORS INC**

ATTN: Erin Bender, Sr Counsel / Legal Department

1901 Market St. Fl 43

Philadelphia, PA 19103

Litigation Area PH No: 215-241-9995 Fax No: 215-241-2624

erin.bender@ibx.com

**MINNESOTA DEPARTMENT OF HUMAN RIGHTS**

c/o Rebecca Lucero (commissioner of MDHR)

ATTN: Case Support - #72683

540 Fairview Ave N. #201

St. Paul, MN 55104

Rebecca.Lucero@public.govdelivery.com

1



SCANNED

NOV 1 5 2022

U.S. DISTRICT COURT ST. PAUL

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

c/o Julianna Bowman (Director of Chicago District)

ATTN: Case Support - #444-2019-01685

Minneapolis Area Office

330 S 2nd Avenue, Suite 720

Minneapolis, MN 55401

***ATTORNEYS***

***Steven K. Ludwig was the attorney that last represented the following:***

*a) AmeriHealth Administrators Inc*

*b) Independence Blue Cross of PA*

*c) Michele Schumacher, Director HR Department,*

*d) Jane Doe AHA-000252, coworker (anonymous witness)*

*e) John Clayton, Director of Diversity & Workforce Initiatives*

*f) Jeffrey Kearns, Learning/onboarding Manager*

*g) Tashima Waller, Senior Learning Specialist*

***DEFENDANTS***

AMERIHEALTH ADMINISTRATORS INC

INDEPENDNCE BLUE CROSS OF PA

MICHELE SCHUMACHER, IBC HR Director Manager

JOHN CLAYTON, Director of Diversity & Workforce initiatives

JEFFREY KEARNS, Learning/Onboarding Manager

TASHIMA WALLER, Senior Learning Specialist

JANE DOE AHA-000252, AHA employee

MINNESOTA DEPARTMENT OF HUMAN RIGHTS

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

CHARLOTTE CZARNECKI, EEOC Investigator, CHARLOTTE.CZARNECKI@EEOC.GOV